UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No. _____ |
| | ) |
| GLOBAL PARTNERS LP; | ) |
| GLOBAL COMPANIES LLC; | ) |
| CHELSEA SANDWICH LLC, | ) |
| | ) |
| | ) |
| Defendants. | ) |
| | ) |

## COMPLAINT

The United States of America, by the authority of the Attorney General, through the undersigned attorneys, acting at the request of the Administrator of the Environmental Protection Agency ("EPA"), files this Complaint against Global Partners LP ("Global Partners"), Global Companies LLC ("Global Companies") and Chelsea Sandwich LLC ("Chelsea") (collectively, "Defendants") and alleges as follows:

## NATURE OF ACTION

1. This is a civil action under Section 113(a)(1) of the Clean Air Act ("CAA" or the "Act"), 42 U.S.C. § 7413(a)(1), and the Maine state implementation plan ("ME SIP"), including federally approved portions of Maine's air pollution control regulations, 06-096 Code of Maine Rules, Chapters 100-165 ("ME APC Regulations"), promulgated by the Maine Department of Environmental Protection ("ME DEP"). The United States seeks civil penalties and injunctive relief for violations of these statutes and regulations, under Section 113 of the Act.

## PARTIES

2. Plaintiff is the United States of America. Authority to bring this action is vested in the Attorney General by Section 305 of the Act, 42 U.S.C. § 7605, and 28 U.S.C. §§ 516 and 519.

3. Defendant Global Partners is a limited partnership, formed in March 2005 under the laws of the State of Delaware, with headquarters located at 800 South Street, Waltham, Massachusetts 02454-0161.

4. Global Partners is an owner and/or operator of a petroleum storage facility, known as "Global Portland," located at 1 Clark Road, South Portland, Cumberland County, Maine 04106 (the "Facility").

5. Global Partners is a "person" within the meaning of Section 302(e) of the Act, 42 U.S.C. § 7602(e).

6. Defendant Global Companies, an affiliate of Global Partners, is a limited liability company formed in 1998 under the laws of the State of Delaware, with principal office located at 800 South Street, Suite 500, Waltham, Massachusetts 02454-9167.

7. Global Companies is an owner and/or operator of the Facility.

8. Global Companies is a "person" within the meaning of Section 302(e) of the Act, 42 U.S.C. § 7602(e).

9. Defendant Chelsea, an affiliate of Global Partners, is a limited liability company, formed in 1998 under the laws of the State of Delaware, with headquarters located at 800 South Street, Suite 500, Waltham, Massachusetts 02453.

10. Chelsea owns the Facility.

11.  Chelsea is a "person" within the meaning of Section 302(e) of the Act, 42 U.S.C. § 7602(e).

## JURISDICTION AND VENUE

12.  This Court has jurisdiction over the subject matter of this action, and over Defendants, under Sections 113(a)(1), (a)(3), and (b) of the Act, 42 U.S.C. §§ 7413(a)(1), (a)(3) and (b), and 28 U.S.C. §§ 1331, 1345, and 1355.

13.  Venue is proper in this District under Sections 113(a)(1), (a)(3), and (b) of the Act, 42 U.S.C. §§ 7413(a)(1), (a)(3) and (b), and 28 U.S.C. §§ 1391(b)-(c) and 1395(a), because all or a substantial part of the events or omissions giving rise to the claims in this Complaint occurred within this District, all or a substantial part of the property that is the subject of this action is situated in this District, the defendant is subject to the Court's personal jurisdiction, and the civil penalties sought in this action have accrued in this District.

14.  Notice of commencement of this action has been given to the State of Maine, under Section 113(b) of the Act, 42 U.S.C. § 7413(b).

## STATUTORY AND REGULATORY FRAMEWORK

15.  The Clean Air Act, 42 U.S.C. §§ 7401 *et seq.*, establishes a comprehensive scheme for air pollution prevention and control, as described in Section 101 of the Act, 42 U.S.C. § 7401.

16.  Congress enacted the Act "to protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare and the productive capacity of its population." 42 U.S.C. § 7401(b)(1).

17.     Section 110(a) of the Act, 42 U.S.C. § 7410(a), requires that each state prepare a state implementation plan ("SIP") incorporating regulations designed to attain and maintain healthful air quality.  A state must submit its SIP, including any revisions thereto, to EPA for approval.  Once EPA has approved a SIP, the federal government may enforce the SIP's requirements and may enforce any SIP-authorized permits.  42 U.S.C. § 7413(a)-(b).

18.     EPA has designated ozone as an ambient air pollutant, and has developed a national ambient air quality standard ("NAAQS") for ozone.  40 C.F.R. § 50.9.  Ground-level ozone is the primary ingredient in smog.  Ozone forms when volatile organic compounds ("VOCs") react with nitrogen oxides in sunlight.  To control ozone formation, EPA and the states have generally sought to control VOC and nitrogen oxide emissions.

19.     Since May 2001 or earlier, South Portland, Maine, was in a NAAQS nonattainment area for ozone.  During that time, Section 184(b)(2) of the Act, 42 U.S.C. § 7511c(b)(2), required that the ME SIP incorporate more stringent VOC controls than those required in ozone attainment areas.  Although the area is now designated as in attainment with the ozone NAAQS, South Portland remains subject to nonattainment area VOC emission control requirements under the ME SIP because it is in an Ozone Transport Region, under Section 184 of the Act, 42 U.S.C. § 7511c.

20.     Maine adopted a "state implementation plan" within the meaning of Sections 110 and 113(a)(1) of the Act, 42 U.S.C. §§ 7410, 7413(a)(1).  The ME SIP has been approved by EPA under CAA Section 110.

21.     The term "source" is defined in Chapter 100 of the ME SIP to mean "any building, structure, facility, or installation which emits or may emit any regulated pollutant."

The term "facility, building, structure, or installation" is defined in ME SIP Chapter 100 to mean "all of the pollutant-emitting activities which belong to the same industrial grouping, are located on one or more contiguous or adjacent properties, and are under the control of the same person (or persons under common control)."

22. A "major source" as defined in Chapter 100 of the Maine SIP includes any source that is subject to 40 C.F.R. Part 70 that has not been issued a Part 70 license (*i.e.*, a Title V operating permit) and which emits or has the potential to emit fifty tons per year or more of VOCs in the ozone transport region. *See also* Section 501(2)(B) of the Act, 42 U.S.C. § 7661(2)(B), and 40 C.F.R §§ 70.2 and 70.3(a) and (b).

23. Under Chapter 115 of the ME SIP, entitled "Emission License Regulations," Section II.A, no person may emit any air contaminant from any source without an air emission license, unless the source falls within one of the exemptions in Section II.C of Chapter 115.

24. Under Chapter 115, Section V.A.2.a of the Maine SIP, to receive an air emission license, an owner or operator must demonstrate, among other things, that the air emissions from its facility will be receiving "best practical treatment" (or "BPT"), including where appropriate the technology requirements specified in Section VI of Chapter 115.

25. Under Chapter 134 of the ME SIP, entitled "Reasonably Available Control Technology for Facilities that Emit Volatile Organic Compounds (VOC RACT)," Section 3, the owner or operator of any facility that emits or has the potential to emit at least 40 tons per calendar year of VOCs, and does not fall within one of the enumerated exemptions, must comply with reasonably available control technology ("RACT") requirements.

26. Under Section 503(c) of the Act, 42 U.S.C. § 7661b(c), and 40 C.F.R § 70.5, major sources are required to apply for and obtain a Title V operating permit no later than 12 months after becoming subject to a federally approved state Title V operating permit program, or such earlier date as the state may establish. At all times relevant to the allegations in this Complaint, Maine has had an approved Title V operating permit program (as of March 24, 1997). The requirements of this program are set forth in Chapter 140 of the ME SIP. In this case, Defendants' needed to apply for a Title V operating permit by September 2003.

27. Section 502(a) of the Act, 42 U.S.C. § 7661a(a), and 40 C.F.R. § 70.7(b), prohibit a major source from operating except in accordance with a Title V operating permit after the effective date of any permit program approved or promulgated under Title V of the Act.

28. Under Section 113(a)(3)(B) of the Act, 42 U.S.C. § 7413(a)(3)(B), if the Administrator of EPA finds that any person has violated a requirement or prohibition of, *inter alia,* Subchapter I of the Act, 42 U.S.C. §§ 7401-7515, Subchapter V of the Act, 42 U.S.C. §§ 7661-7661f, or any rule promulgated under CAA Subchapters I and V, then the Administrator may issue an order requiring the person to comply with such requirement or prohibition.

29. Section 113(b) of the Act, 42 U.S.C. § 7413(b), authorizes the United States to commence a civil judicial enforcement action for violations of any requirement or prohibition of Subchapter I of the Act, 42 U.S.C. §§ 7401-7515, Subchapter V of the Act, 42 U.S.C. §§ 7661-7661f, or any rule or order promulgated or issued under CAA Subchapters I or V, seeking civil penalties of up to $25,000 per day for each violation, injunctive relief, or both.

30. Under the Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. § 2461 ("DCIA"), as amended by the Debt Collection Improvement Act of 1996, 31 U.S.C.

§ 3701, and EPA's Civil Monetary Penalty Inflation Adjustment Rule, 40 C.F.R. Part 19, promulgated under the DCIA (collectively, the "Inflation Adjustment Rule"), the maximum amount of civil penalties for which a person shall be liable under CAA Section 113(b), 42 U.S.C. § 7413(b), was increased to $27,500 per day for each violation occurring after January 30, 1997, through March 15, 2004; $32,500 per day for each violation occurring after March 15, 2004, through January 12, 2009; $37,500 per day for each violation occurring after January 12, 2009, through November 2, 2015; $93,750 per day for each violation occurring after November 2, 2015, and assessed on or after August 1, 2016, but before January 15, 2017; $95,284 per day for each violation occurring after November 2, 2015, and assessed on or after January 15, 2017, but before January 15, 2018; and $97,229 per day for each violation occurring after November 2, 2015, and assessed on or after January 15, 2018.

## GENERAL ALLEGATIONS

31. At all times relevant to the allegations in this Complaint, Defendant Chelsea has been an "owner" of the Facility, within the meaning of Chapter 100 of the ME SIP.

32. At all times relevant to the allegations in this Complaint, Defendant Global Partners has been an "owner" or "operator" of the Facility, within the meaning of Chapter 100 of the ME SIP.

33. At all times relevant to the allegations in this Complaint, Defendant Global Companies has been an "owner" or "operator" of the Facility, within the meaning of Chapter 100 of the ME SIP.

34. At all times relevant to the allegations in this Complaint, the Facility has included 12 petroleum storage tanks. Defendants have used four of those tanks to store No. 6 fuel oil (also known as "bunker fuel" or "bunker oil") or asphalt.

35. Since on or around September 2002, Defendants have stored No. 6 oil in two tanks, known as Tank Nos. 1 and 2. From on or around September 2002 to February 2010, Defendants stored No. 6 oil in one tank, known as Tank No. 9. From on or around September 2002 to on or around March 2016, Defendants stored No. 6 oil in one tank, known as Tank No. 3.

36. Since February 2010, Defendants have stored asphalt in Tank No. 9. Since on or around March 2016, Defendants have stored asphalt in Tank No. 3.

37. At all times relevant to the allegations in the Complaint, Defendants' activity at the Facility have included, without limitation, the transfer (from barges, other vessels, or trucks) into tanks, the storage in tanks, and the loading (into trucks through a loading rack) of petroleum products. Specifically, the Facility transfers petroleum products, including No. 6 oil and asphalt, by pumping them from barges or other vessels on the Fore River, through pipes, to the Facility's storage tanks. From these tanks, the petroleum products, including No. 6 oil and asphalt, are loaded into tanker trucks (by pumping the products through pipes to a truck loading rack) or into marine vessels.

38. No. 6 oil and asphalt are solid or semi-solid at ambient temperatures and must be heated in order to remain in liquid form, with low enough viscosity to be pumped in and out of barges or other vessels, storage tanks, and tanker trucks. To keep these petroleum products in

liquid form, with sufficiently low viscosity, the No. 6 oil and asphalt storage tanks at the Facility are heated to above-ambient temperatures.

39.     During the period of Chelsea's ownership and Global Partners' and Global Companies' ownership and/or operation of the South Portland Facility, the Facility has emitted VOC.

40.     By letter dated November 2, 2011, EPA issued to Global Partners an information reporting requirement and testing order, under Section 114 of the Act, 42 U.S.C. § 7414 ("November 2011 Order").  The November 2011 Order required Global Partners, among other things, to monitor and sample air, including VOC levels, in the headspace of storage tanks containing No. 6 oil and asphalt at the Facility, and to monitor and sample VOC in air emissions from loading operations at the facilities that Global Partners operate in New England.

41.     By letter dated March 29, 2012, EPA issued to Global Partners an information reporting requirement, under Section 114 of the Act, 42 U.S.C. § 7414 ("March 2012 Order"). The March 2012 Order required Global Partners to provide information to EPA regarding, among other things, throughput capacity of No. 6 oil and asphalt, date of purchase or installation of each loading rack, dates each storage tank and loading rack was put into service and taken out of service, and information on each capital project, including installations, repairs, and retrofits.

42.     By letter dated May 23, 2012, Global Partners submitted a response to EPA's March 2012 Order.

43.     On or about August 16, 2012, under the November 2011 Order, Global Partners completed VOC emissions testing for asphalt at the Facility.  On November 14, 2012, Global Partners submitted to EPA a report on its August 2012 testing.

44. On or about July 2, 2013, under the November 2011 Order, Global Partners completed VOC emissions testing for No. 6 oil at the Facility. On August 9, 2013, Global Partners submitted to EPA a report on its July 2013 testing.

45. The Facility does not qualify for any of the exemptions to the requirement in the ME SIP Chapter 115, Section 1.B, to obtain an air emission license.

46. The Facility does not qualify for any of the exemptions to the RACT requirements in the ME SIP Chapter 134, Section 1.A.

47. On January 23, 2013, ME DEP issued to Global Companies an air emission license for the Facility ("Emission License"). The Emission License establishes a Facility-wide limit on VOC emissions of 21.9 tons per year. But in establishing this limit, the Emission License does not take into account emissions from the Facility's No. 6 oil and asphalt transfer, storage or loading activities.

48. Under the terms of the Emissions License, Defendants were permitted to store only No. 6 oil in Tank No. 3. Pursuant to a request in January 2016 by Global Companies for a minor revision to the Emissions License in order to be able to store either No. 6 oil or asphalt in Tank No. 3, ME DEP issued an amendment to the Emission License on March 14, 2016 ("License Amendment No. 1") granting the request. The License Amendment No. 1 stated that the revision did not change total annual emissions from the facility.

49. The results of Global Partners' VOC emissions testing at the Facility show that the potential emissions from its No. 6 oil and asphalt transfer, storage, and loading activities alone exceed 40 tons per year.

50. On June 6, 2014, EPA issued a Notice of Violation to Global Partners for the Facility ("NOV No. 1"). NOV No. 1 alleges that:

    a. Based on the Facility's licensed VOC emissions limit plus its potential VOC emissions from the Facility's No. 6 oil and asphalt transfer, storage and loading activities, the Facility has potential VOC emissions greater than 50 tons per year and is a major source of VOC.

    b. As an owner or operator of a major source of VOC emissions, Defendants must obtain a license that takes into account VOC emissions from all of its No. 6 oil and asphalt transfer, storage and loading activities at the Facility.

    c. Defendants are subject to the requirement to, at a minimum, apply "best practical treatment" to its VOC emissions from its No. 6 oil and asphalt transfer, storage and loading activities at the Facility.

    d. To date, Defendants have not applied "best practical treatment" to all such operations.

    e. The Facility also has exceeded the Facility-wide VOC emissions limit in its Emission License.

    f. Accordingly, Defendants have violated and continue to violate both the ME SIP and its Emission License.

51. On April 7, 2015, EPA issued another Notice of Violation to Global Partners for the Facility ("NOV No. 2"). NOV No. 2 alleges that:

    a. Under Chapter 134 of the ME SIP, the owner or operator of any facility that emits or has the potential to emit at least 40 tons per year of VOC must comply with reasonably available control technology ("RACT") requirements. These requirements include, among other things, VOC emission standards (ME SIP Ch. 134 § 3.A) and emission reduction planning (*id.* § 3.B).

    b. As a facility with storage tanks that contain volatile organic liquids (such as No. 6 oil and asphalt) that emit VOC, Defendants' Facility was subject to ME SIP Chapter 134 effective February 15, 1995. *Id.* § 1.B.2.

    c. The VOC emissions testing for No. 6 oil and asphalt at the Facility indicate that potential emissions from No. 6 oil and asphalt transfer, storage and loading activities exceed 40 tons per year. Therefore, the Facility is subject to the VOC RACT requirements in Chapter 134 of the ME SIP.

    d. Defendants have failed to comply with the VOC RACT requirements of the ME SIP Chapter 134, Section 3, at the Facility.

    e. Defendants have violated and continues to violate Chapter 134 of the ME SIP.

### FIRST CLAIM FOR RELIEF
(ME SIP Chapter 115 – Failure to Obtain Emission License)

52. All other paragraphs of this Complaint are incorporated by reference as if set forth fully herein.

53. As described above in paragraph 50b, Defendants were required to obtain an

Emission License addressing VOC emissions from all of its No. 6 oil and asphalt transfer, storage and loading activities at the Facility, but failed to do so.

54. Defendants were required, at a minimum, to apply "best practical treatment" to its emissions from all No. 6 oil and asphalt transfer, storage and loading activities at the Facility, but failed to do so.

55. Defendants violated Chapter 115 of the ME SIP every day that they failed to apply for a license addressing VOC emissions from all No. 6 oil and asphalt transfer, storage and loading activities at its Facility.

56. Defendants violated Chapter 115 of the ME SIP every day that it failed to control VOC emissions by applying, at a minimum, "best practical treatment" to all of its No. 6 oil and asphalt transfer, storage and loading activities at the Facility.

57. Under Section 113(b) of the Act, 42 U.S.C. § 7413(b), as amended by the DCIA and the Inflation Adjustment Rule, Defendants are liable for the payment of a civil penalty to the United States of up to $32,500, per day for each violation occurring after March 15, 2004, through January 12, 2009; up to $37,500 per day for each violation occurring after January 12, 2009, through November 2, 2015; up to $93,750, per day for each violation occurring after November 2, 2015, and assessed on or after August 1, 2016, but before January 15, 2017; up to $95,284, per day for each violation occurring after November 2, 2015, and assessed on or after January 15, 2017, but before January 15, 2018; and up to $97,229 per day for each violation occurring after November 2, 2015 and assessed on or after January 15, 2018, of Chapter 115 of the ME SIP.

**SECOND CLAIM FOR RELIEF**
(ME SIP Chapter 115 – Violation of Emission License)

58. All other paragraphs of this Complaint are incorporated by reference as if set forth fully herein.

59. Under the Emissions License, Defendants have been required to limit its total actual VOC emissions at the Facility to no more than 21.9 tons per year.

60. At all times since January 23, 2013, the Facility's actual VOC emissions have exceeded 21.9 tons per year.

61. At all times since January 23, 2013, Defendants have violated the Emission License for the Facility.

62. Defendants violated Chapter 115 of the ME SIP every day that they failed to comply with the Facility-wide limit on actual VOC emissions in the Emission License.

63. Under Section 113(b) of the Act, 42 U.S.C. § 7413(b), as amended by the DCIA and the Inflation Adjustment Rule, Defendants are liable for the payment of a civil penalty to the United States of up to $32,500 per day for each violation occurring after March 15, 2004, through January 12, 2009; up to $37,500 per day for each violation occurring after January 12, 2009, through November 2, 2015; up to $93,750 per day for each violation occurring after November 2, 2015, and assessed on or after August 1, 2016, but before January 15, 2017; up to $95,284 per day for each violation occurring after November 2, 2015, and assessed on or after January 15, 2017, but before January 15, 2018; and up to $97,229 per day for each violation occurring after November 2, 2015 and assessed on or after January 15, 2018, of Chapter 115 of the ME SIP.

**THIRD CLAIM FOR RELIEF**
(ME SIP Chapter 134 – Violation of Emission Control Requirements)

64. All other paragraphs of this Complaint are incorporated by reference as if set forth fully herein.

65. Because the No. 6 oil and asphalt transfer, storage and loading activities at the Facility have a total potential to emit VOC at a level greater than 40 tons per year, the Facility is subject to the VOC RACT requirements set forth in the ME SIP Chapter 134, Section 3.

66. At all times relevant to the allegations in this Complaint, the No. 6 oil and asphalt transfer, storage and loading activities at the Facility have the potential to emit VOC at levels greater than 40 tons per year.

67. At all times relevant to the allegations in this Complaint, the Facility has been subject to the VOC RACT requirements set forth in the ME SIP, Chapter 134, Section 3. These requirements include, among other things, VOC emission standards (ME SIP § 3.A) and emission reduction planning (ME SIP § 3.B).

68. At all times relevant to the allegations in the Complaint, Defendants have failed to meet the RACT requirements for VOC at the Facility, including, among other things, VOC emission standards (*id.* § 3.A) and emission reduction planning (*id.* § 3.B).

69. Defendants violated Chapter 134 of the ME SIP every day that they failed to comply with the RACT requirements for VOC at the Facility.

70. Under Section 113(b) of the Act, 42 U.S.C. § 7413(b), as amended by the DCIA and the Inflation Adjustment Rule, Defendants are liable for the payment of a civil penalty to the United States of up to $32,500 per day for each violation occurring after March 15, 2004,

through January 12, 2009; up to $37,500 per day for each violation occurring after January 12, 2009 through November 2, 2015; up to $93,750 per day for each violation occurring after November 2, 2015 and assessed on or after August 1, 2016 but before January 15, 2017; up to $95,284 per day for each violation occurring after November 2, 2015 and assessed on or after January 15, 2017 but before January 15, 2018; and up to $97,229 per day for each violation occurring after November 2, 2015 and assessed on or after January 15, 2018, of Chapter 134 of the ME SIP.

**FOURTH CLAIM FOR RELIEF**
(CAA Section 502(a) and 503(c), 40 C.F.R. §§ 70.5 and 70.7(b) – Violation of Title V Permit Program Requirements)

71. All other paragraphs of this Complaint are incorporated by reference as if set forth fully herein.

72. As described above in paragraphs 35, 47, and 50a, based on the Facility's licensed VOC emissions limit plus its potential VOC emissions from the Facility's No. 6 oil and asphalt transfer, storage and loading activities, the Facility has potential VOC emissions greater than 50 tons per year and is a major source of VOCs (as of September 2002).

73. On March 24, 1997, EPA granted interim approval of the Maine Title V Program, as set forth at Chapter 140 of the ME APC Regulations. *See* 40 C.F.R. Part 70.

74. Under Section 503(c) of the Act, 42 U.S.C. § 7661b(c) and 40 C.F.R. § 70.5, Defendants were required to apply for a Title V operating permit that identified all applicable requirements by no later than September 2003 (*i.e.*, within 12 months after Defendants began to store No. 6 oil in Tank Nos. 1, 2, 3 and 9).

75.     Under Section 502(a) of the Act, 42 U.S.C. § 7661a(a), and 40 C.F.R. § 70.7(b), Defendants are prohibited from operating the Facility except in accordance with a Title V operating permit.

76.     Since May 2001 or earlier, Defendants have not applied for a Title V operating permit for the Facility, in violation of Section 503(c) of the Act, 42 U.S.C. § 7661b(c), and 40 C.F.R. § 70.5.

77.     Since May 2001 or earlier, Defendants have owned or operated the Facility without a Title V operating permit, in violation of Section 502(a) of the Act, 42 U.S.C. § 7661a(a), and 40 C.F.R. § 70.7(b).

78.     Under Section 113(b) of the Act, 42 U.S.C. § 7413(b), as amended by the DCIA and the Inflation Adjustment Rule, Defendants are liable for the payment of a civil penalty to the United States of up to $32,500 per day for each violation occurring after March 15, 2004, through January 12, 2009; up to $37,500 per day for each violation occurring after January 12, 2009, through November 2, 2015; up to $93,750 per day for each violation occurring after November 2, 2015, and assessed on or after August 1, 2016, but before January 15, 2017; up to $95,284 per day for each violation occurring after November 2, 2015, and assessed on or after January 15, 2017, but before January 15, 2018; and up to $97,229 per day for each violation occurring after November 2, 2015, and assessed on or after January 15, 2018, of Sections 503(c) and 502(a) of the Act, 42 U.S.C. §§ 7661b(c) and 7661a(a), and 40 C.F.R. §§ 70.5 and 70.7.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff United States of America respectfully requests that this Court enter judgment, for the United States and against Defendants, providing the following relief:

1. Permanently enjoin Defendants from all ongoing violations referenced in this Complaint, of the Act, of the Act's implementing regulations, and of the ME SIP, including Chapters 115 and 134;

2. Order Defendants to comply with Part D of Subchapter I of the Act, 42 U.S.C. §§ 7501-7515, Subchapter V of the Act, 42 U.S.C. §§ 7661-7661f, the Act's implementing regulations, and the ME SIP, including Chapters 115 and 134;

3. Order Defendants to pay a civil penalty for each day of each violation referenced in this Complaint, of the Act, of the Act's implementing regulations, and the ME SIP, including Chapters 115 and 134, enumerated in this Complaint;

4. Award the United States its costs of this action; and

5. Grant the United States such other relief as the Court deems just and proper.

Respectfully Submitted,

ELLEN M. MAHAN
Deputy Section Chief
Environmental Enforcement Section
Environment and Natural Resources Division
U.S. Department of Justice

March 25, 2019  /s/ Patrick B. Bryan
Dated  PATRICK B. BRYAN
Trial Attorney
DAVID L. WEIGERT
Senior Attorney
Environmental Enforcement Section
Environment and Natural Resources Division
U.S. Department of Justice
P.O. Box 7611
Washington, D.C.  20044-7611
(202) 616-8299 (PBB)
(202) 514-0133 (DLW)
patrick.bryan@usdoj.gov
david.weigert@usdoj.gov

HALSEY B. FRANK
United States Attorney
District of Maine

JOHN G. OSBORN
Chief, Civil Division
U.S. Attorney's Office, District of Maine
100 Middle Street Plaza
East Tower, Sixth Floor
Portland, Maine 04101
(207) 780-3257
john.osborn2@usdoj.gov

OF COUNSEL:

WILLIAM D. CHIN
THOMAS OLIVIER
U.S. EPA, Region 1
5 Post Office Square
Suite 100 (Mail Code OES 04-4)
Boston, MA 02109-3912