**UNITED STATES DISTRICT COURT**
**DISTRICT OF MAINE**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 2:19-cv-00122-DBH |
| | ) | |
| GLOBAL PARTNERS LP; | ) | |
| GLOBAL COMPANIES LLC; | ) | |
| CHELSEA SANDWICH LLC, | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**UNITED STATES' CONSENTED-TO MOTION TO ENTER**
**CONSENT DECREE WITH INCORPORATED MEMORANDUM OF LAW**

## <u>TABLE OF CONTENTS</u>

I.    BACKGROUND ..................................................................................................... 2
      A.  Statutes And Regulations ............................................................................ 2
      B.  Defendants' Facility And Underlying Facts ................................................ 5
      C.  Complaint .................................................................................................... 8
      D.  Litigation Costs and Risks .......................................................................... 8
II.   THE CONSENT DECREE .................................................................................... 9
      A.  Injunctive Relief and Other Measures ...................................................... 10
      B.  Supplemental Environmental Project ........................................................ 12
      C.  Penalty ....................................................................................................... 14
III.  ARGUMENT ........................................................................................................ 14
      A.  Legal Standard for Approval of a Consent Decree ................................... 14
      B.  The Decree Is Reasonable, Fair and Consistent with the Act .................. 18
          1.   The Consent Decree is Fair .............................................................. 18
          2.   The Consent Decree is Reasonable ................................................... 21
          3.   The Consent Decree Advances the Act's Goals ............................... 23
      C.  The Comments Received During the Period for Public Comment Do Not
          Warrant Disapproval of the Consent Decree ............................................. 23
IV.   CONCLUSION ..................................................................................................... 27

TABLE OF AUTHORITIES

Cases:

*City of Bangor v. Citizens Commc'n Co.*,
  532 F.3d 70 (1st Cir. 2008) ......................................................................... 15, 19, 20
*Conservation Law Found. of New England, Inc. v. Franklin*,
  989 F.2d 54 (1st Cir. 1993) ............................................................................. 14, 16
*Cotton v. Hinton*,
  559 F.2d 1326 (5th Cir. 1977) ............................................................................... 17
*Fed. Trade Comm'n v. Standard Fin. Mgmt. Corp.*,
  830 F.2d 404 (1st Cir. 1987) ................................................................................. 16
*FTC v. Guignon*,
  390 F.2d 323 (8th Cir. 1968) ................................................................................. 17
*Harris v. Pernsley*,
  654 F. Supp. 1042 (E.D. Pa. 1987),
    *aff'd* 820 F.2d 592 (3d. Cir. 1987 ...................................................................... 15
*In re Acushnet River & New Bedford Harbor*,
  712 F. Supp. 1019 (D. Mass. 1989) ...................................................................... 16
*In re Idaho Conservation League*,
  811 F.3d 502 (D.C. Cir. 2016) .............................................................................. 15
*Kelley v. Thomas Solvent Co.*,
  717 F.Supp. 507 (W.D. Mich. 1989) ..................................................................... 17
*Sam Fox Publ'g Co. v. United States*,
  366 U.S. 683 (1961) ......................................................................................... 16, 17
*Swift & Co. v. United States*,
  276 U.S. 311 (1928) ............................................................................................... 17
*United States v. Bechtel Corp.*,
  648 F.2d 660 (9th Cir. 1981) ................................................................................. 17
*United States v. Cannons Eng'g Corp*,
  720 F. Supp. 1027 (D. Mass. 1989) ................................................................. 16, 20
*United States v. Cannons Eng'g Corp.*,
  899 F.2d 79 (1st Cir. 1990) ........................................................................... passim
*United States v. Charles George Trucking, Inc.*,
  34 F.3d 1081 (1st Cir. 1994) ........................................................................... 16, 23
*United States v. Colorado*,
  937 F.2d 505 (10 Cir. 1991) ........................................................................... 15, 17
*United States v. Comunidades Unidas Contra la Contaminacion*,
  204 F.3d 275 (1st Cir. 2000) ........................................................................... passim
*United States v. Davis*,
  261 F.3d 1 (1st Cir. 2001) ......................................................................... 18, 20, 21
*United States v. District of Columbia*,
  933 F.Supp. 42 (D.D.C. 1996) ...................................................................... 19, 21, 22
*United States v. Hercules, Inc.*,

961 F.2d 796 (8th Cir. 1992) ................................................................. 17
*United States v. Kerr-McGee Corp*.,
    2008 WL 863975 (D. Colo. Mar. 26, 2008) ...................................... 21
*United States v. Oregon*,
    913 F.2d 576 (9th Cir. 1990) ......................................................... 20
*United States v. Town of Moreau, New York*,
    979 F. Supp. 129 (N.D.N.Y.1997) .................................................. 21

Statutes:

The Clean Air Act ("CAA")
    Section 101(b)(1), 42 U.S.C. § 7401(b)(1) ...................................... 23
    Section 110(a), 42 U.S.C. § 7410(a) .................................................. 2
    Section 112, 42 U.S.C. § 7412 ......................................................... 25
    Section 113(a), 42 U.S.C. § 7413(a) ................................................. 7
    Section 113(a)(1), 42 U.S.C. § 7413(a)(1) .......................................... 2
    Section 113(a)-(b), 42 U.S.C. § 7413(a)-(b) ...................................... 2
    Section 113(b), 42 U.S.C. § 7413(b) ................................................. 8
    Section 114, 42 U.S.C. § 7414 .......................................................... 6
    Section 184c(b)92), 42 U.S.C. § 7511c(b)(2) ..................................... 3
    Section 502(2)(B), 42 U.S.C. § 7661(2)(B) ........................................ 4
    Section 502a(a), 42 U.S.C. § 7661a(a) ........................................... 4, 8
    Section 502b(c), 42 U.S.C. § 7661b(c) .............................................. 4

Regulations:

28 C.F.R. § 50.7 ................................................................................... 1
40 C.F.R § 70.5 .................................................................................... 4
40 C.F.R §§ 70.2 .................................................................................. 4
40 C.F.R. § 50.9 ................................................................................... 3
40 C.F.R. § 70.7(b) .............................................................................. 4
40 C.F.R. Part 70 .................................................................................. 4

Other Authorities:

56 Fed. Reg. 56694 ............................................................................... 3
71 Fed. Reg. 71489 ............................................................................... 3
79 Fed. Reg. 6329 ............................................................................... 13
80 Fed. Reg. 13671 ............................................................................. 13
84 Fed. Reg. 12293-94 .......................................................................... 1
84 Fed. Reg. 18867-68 .......................................................................... 1

INTERNET SOURCES

"An Act To Ensure Public Notifications of Air Violations",
https://www.maine.gov/governor/mills/news/governor-mills-signs-bills-law-2019-06-17 .........24

"Criteria Air Pollutants": https://www.epa.gov/criteria-air-pollutants .......................................24

Enforcement and Compliance History Online: http://echo.epa.gov ................................................7

EPA Approved Regulations in the Maine SIP:
https://www.epa.gov/sips-me/epa-approved-regulations-maine-sip..................................................2

EPA's 1991 Clean Air Act Stationary Source Civil Penalty Policy:
https://www.epa.gov/enforcement/clean-air-act-stationary-source-civil-penalty-policy-october-
25-1991. .............................................................................................................................................14

Global Partners LP homepage, http://www.globalp.com ..............................................................5

Ground-Level Ozone Pollution – Ground-Level Ozone Basics:
https://www.epa.gov/ground-level-ozone-pollution/ground-level-ozone-basics ...........................2

"Mills Signs Bill Requiring State To Alert Communities To Federal Air Quality Violations,"
Portland Press Herald, June 18, 2019 (updated June 19, 2019), by Scott Thistle,
https://www.pressherald.com/2019/06/18/mills-signs-bill-requiring-state-to-notify-cities-of-
federal-air-quality-violations/ ........................................................................................................24

Region 1: EPA New England – "The Ozone Problem":
https://www3.epa.gov/region1/airquality/oz_prob.html.......................................................... 2,3,13

South Portland Partners With ME DEP for Air Quality Monitoring," May 30, 2019,
https://www.southportland.org/files/4015/5931/4906/Press_Release_-
_DEP_Air_Quality_Monitoring_053019.pdf  ..................................................................24, 26

"The Clean Air Act in a Nutshell: How it Works", pages 4 and 8:
 https://www.epa.gov/sites/production/files/2015-05/documents/caa_nutshell.pdf. .....................3

"The Plain English Guide to the Clean Air Act", April 2007, at page 7:
https://www.epa.gov/clean-air-act-overview/plain-english-guide-clean-air-act. ...........................3

U.S. Envtl. Prot. Agency, EPA Supplemental Environmental Projects Policy 7 (Mar. 10,
2015): https://www.epa.gov/enforcement/2015-update-1998-us-epa-supplemental-
environmental-projects-policy. ......................................................................................................12

U.S. Envtl. Prot. Agency, AP-42, Vol. 1, Ch. 1.10, Residential Wood Stoves, at 1.10.2:
https://www3.epa.gov/ttn/chief/ap42/ch01/final/c01s10.pdf; .......................................................13

U.S. Envtl. Prot. Agency, "BurnWise, Wood Smoke and Your Health":
https://www.epa.gov/burnwise/wood-smoke-and-your-health ....................................................13

Plaintiff, the United States of America, on behalf of the United States Environmental Protection Agency ("EPA"), respectfully submits this consented-to motion to enter the Consent Decree lodged with the Court on March 25, 2019 (the "Consent Decree" or "Decree"). Consistent with 28 C.F.R. § 50.7, the proposed Decree provides, in Paragraph 79, for a 30-day public comment period. This period began upon the publication of a notice of the Decree's lodging in the Federal Register on April 1, 2019.[1] Considering the level of public interest in the proposed Consent Decree, including requests by the City of South Portland and others for an extension of the public comment period, the United States published a subsequent notice in the Federal Register on May 2, 2019, extending the public comment period through July 1, 2019.[2] During the entire comment period, which is now closed, the United States received approximately 90 public comments. These comments are attached to this Memorandum as Exhibit 1, and are referenced by Bates number. The United States has prepared a Responsiveness Summary, responding to the Comments, which is attached to this Memorandum as Exhibit 2. After carefully reviewing the comments, the United States concludes that the Consent Decree is fair, reasonable, and consistent with the Clean Air Act. Accordingly, the United States requests that the Court approve the Consent Decree and enter it as an order of the Court. Defendants, Global Partners LP, Global Companies LLC, and Chelsea Sandwich LLC (collectively, "Global" or "Defendants"), consent to entry of the Decree.[3]

---

[1] *See* 84 Fed. Reg. 12293-94 (Apr. 1, 2019).

[2] *See* 84 Fed. Reg. 18867-68 (May 2, 2019).

[3] *See* Decree ¶ 79.

1

I.      **BACKGROUND**

   A.      **Statutes And Regulations**

   The United States filed the Complaint on March 25, 2019, under Section 113(a)(1) of the Clean Air Act (the "Act" or "CAA"), 42 U.S.C. § 7413(a)(1), alleging violations of the Maine state implementation plan ("ME SIP").  Section 110(a) of the Act, 42 U.S.C. § 7410(a), requires that each state prepare a state implementation plan ("SIP") incorporating regulations designed to attain and maintain healthful air quality.  A state must submit its SIP, and any revisions to the SIP, to EPA for approval.  If EPA approves a SIP, EPA may enforce the SIP's requirements and any SIP-authorized permits.[4]  The Maine SIP has been approved by EPA.[5]

   The specific environmental concern addressed by the United States' Complaint is the formation of ground-level ozone that may occur as a result of excess or unlicensed emissions of volatile organic compounds ("VOCs").[6]  In that regard, the Complaint seeks civil penalties and injunctive relief arising from excess and unlicensed emissions of VOCs at Defendants' petroleum storage facility in South Portland, Maine (the "Facility").  VOC emissions contribute to ground-level ozone.[7]  Ground-level ozone is a primary ingredient in smog.[8]  Ozone forms

---

[4] *See* Section 113(a)-(b), 42 U.S.C. § 7413(a)-(b).

[5] *See generally* EPA Approved Regulations in the Maine SIP, available on EPA's website at https://www.epa.gov/sips-me/epa-approved-regulations-maine-sip.

[6] *See* Declaration of Elizabeth A. Kudarauskas, attached as Exhibit 3, at ¶ 2.

[7] *See generally* Region 1: EPA New England – The Ozone Problem, available on EPA's website at https://www3.epa.gov/region1/airquality/oz_prob.html.

[8] *See* Ground-Level Ozone Pollution – Ground-Level Ozone Basics, available on EPA's website at https://www.epa.gov/ground-level-ozone-pollution/ground-level-ozone-basics.

when VOCs react with oxides of nitrogen ("NOx") in sunlight.[9]  Under the Act, EPA has

designated ozone as an ambient air pollutant, and has developed a national ambient air quality

standard ("NAAQS") for ozone.[10]  From 1992 through 2006, South Portland, Maine, was in a

NAAQS nonattainment area for ozone.[11] [12]  During that time, under Section 184(b)(2) of the

Act, 42 U.S.C. § 7511c(b)(2), states in the Ozone Transport Region[13] were required to

incorporate more stringent VOC controls than those required in ozone attainment areas.

Although, since 2007, South Portland has been designated as an attainment area for ozone, it

remains subject to nonattainment area VOC emission control requirements under the ME SIP

because it is in an Ozone Transport Region.[14]  To control ozone formation, EPA and states have

generally sought to control VOCs and NOx emissions. [15]

---

[9] *See generally* Region 1: EPA New England – The Ozone Problem, available on EPA's website at https://www3.epa.gov/region1/airquality/oz_prob.html.

[10] *See* 40 C.F.R. § 50.9.

[11] *See* 56 Fed. Reg. 56694, 56772 (1991).

[12] Areas where the air quality falls short of a NAAQS, such as ozone, are designated as "nonattainment areas."  *See* The Clean Air Act in a Nutshell: How it Works, page 4, available on EPA's website at https://www.epa.gov/sites/production/files/2015-05/documents/caa_nutshell.pdf.  Areas where air quality meets NAAQS standards are called "attainment areas."  *See id.*

[13] The Ozone Transport Region, which includes 12 states along the East Coast and the District of Columbia, from Maine to Virginia, requires specified controls for ozone.  *See generally* The Clean Air Act in a Nutshell: How it Works, page 8, available on EPA's website at https://www.epa.gov/sites/production/files/2015-05/documents/caa_nutshell.pdf.

[14] *See* 71 Fed. Reg. 71489, 71491 (2006).

[15] The Act's structure requires the cooperation of states to reduce air pollution.  For example, when states develop SIPs to reduce air pollutants to allowable levels, they include a permit system as part of their plan to make sure power plants, factories, and other pollution sources meet their goals to clean up the air.  *See generally* The Plain English Guide To The Clean Air Act, April 2007, at page 7, available at https://www.epa.gov/clean-air-act-overview/plain-english-guide-clean-air-act.

In that regard, Chapter 115 of the ME SIP prohibits the emission of any air contaminant, such as VOCs, from any source without an air emission license.  In order to receive an air emission license under Chapter 115, Section V.A.2.a of the ME SIP,  an owner or operator must demonstrate, among other things, that the air emissions from its facility will receive "best practical treatment" ("BPT"), including where appropriate the technology requirements specified in Section VI of Chapter 115.  Under Chapter 134 of the ME SIP, entitled "Reasonably Available Control Technology for Facilities that Emit Volatile Organic Compounds," the owner or operator of any facility that emits or has the potential to emit at least 40 tons per calendar year of VOCs, and does not fall within an enumerated exemption, must comply with reasonably available control technology ("RACT") requirements.

Additional requirements apply to a "major source" of air pollution.  A major source is defined in Chapter 100 of the ME SIP as any source subject to 40 C.F.R. Part 70 that has not been issued a Part 70 license (*i.e.*, an operating permit under Title V of the Act) and that emits or has the potential to emit 50 tons per year or more of VOCs.[16]  Section 503(c) of the Act, 42 U.S.C. § 7661b(c), and 40 C.F.R § 70.5, require a major source of air pollution to apply for and obtain a Title V operating permit no later than 12 months after becoming subject to a federally approved state Title V operating permit program, or any earlier date that the affected state may establish.  Maine has an approved Title V operating permit program, which is set forth in Chapter 140 of the ME SIP.  Section 502(a) of the Act, 42 U.S.C. § 7661a(a), and 40 C.F.R.

---

[16] *See also* Section 501(2)(B) of the Act, 42 U.S.C. § 7661(2)(B), and 40 C.F.R §§ 70.2 and 70.3(a) and (b).

§ 70.7(b), prohibit a major source from operating except in accordance with a Title V operating

permit after the effective date of any permit program approved or promulgated under Title V.

### B.    Defendants' Facility And Underlying Facts

Defendants own and operate storage and distribution facilities for petroleum products in

New England, including the Facility.[17]  The Facility contains 12 petroleum storage tanks.[18]

Defendants use four heated tanks to store No. 6 oil and asphalt.[19]  Defendants' activities at the

Facility include, for example, the transfer of petroleum products, including heated No. 6 oil and

asphalt, from barges or other vessels on the Fore River, through pipes, to the Facility's storage

tanks.[20]  From these tanks, the petroleum products, including No. 6 oil and asphalt, are loaded

into tanker trucks (by pumping the products through pipes to a truck loading rack) or into marine

vessels.[21]

As alleged in the Complaint, No. 6 oil and asphalt are solid or semi-solid at ambient

temperatures and must be kept heated to remain in a liquid state, with low enough viscosity so

that these products can be pumped in and out of barges or other vessels, storage tanks, and tanker

---

[17] *See* Global Partners LP homepage, available at http://www.globalp.com (noting that Global "owns, controls or has access to one of the largest terminal networks in New England and New York, through which it distributes gasoline, distillates, residual oil and renewable fuels to wholesalers, retailers, and commercial customers") (visited on Aug. 16, 2019).

[18] *See* Air Emissions License Renewal, at pages 2, 8, 13, and License Emission Amendment at page 2 and 3, attached as Ex. A to the Declaration of Elizabeth A. Kudarauskas (Ex. 3).

[19] *See id.*

[20]  *See id.*

[21]  *See id.*

trucks.[22]  Accordingly, the tanks used to store No. 6 oil and asphalt are heated tanks.[23]  However, heating the No. 6 oil and asphalt above ambient temperatures increases their VOC emissions.[24] In December 2007, Global Partners submitted a voluntary self-disclosure to EPA describing elevated VOC emissions from No. 6 oil in heated tanks at its facility in Chelsea, Massachusetts.[25]  Subsequently, in 2011 and 2012, EPA required Global Partners LP to select a facility and test its VOC emissions from No. 6 oil and asphalt, under authority of Section 114 of the Act, 42 U.S.C. § 7414.[26]  In response, from 2012 to 2013, Defendants conducted emissions testing at the South Portland Facility.[27]

Based on the results of this testing, on June 6, 2014, EPA issued a Notice of Violation ("NOV") to Defendants.[28]  In the 2014 NOV, EPA notified Global of its finding that the Facility was a major source of VOCs.[29]  The NOV also notified Global that it was required to obtain a

---

[22] *See* Complaint ¶; *see generally* Ex. 3 (Kudarauskas Decl.) at ¶¶ 4-6; Air Emissions License Renewal, at pages 2, 8, and 13, and License Emission Amendment at pages 2 and 3, attached as Ex. A to the Declaration of Elizabeth A. Kudarauskas (Ex. 3).

[23] *See* Ex. 3 (Kudarauskas Decl.) at ¶¶ 4-6; Air Emissions License Renewal, at pages 2, 8, and 13, and License Emission Amendment at pages 2 and 3, attached as Ex. A to the Declaration of Elizabeth A. Kudarauskas (Ex. 3).

[24] *See* Ex. 3 (Kudarauskas Decl.) at ¶ 6.

[25] *See* December 10, 2007 Letter from Global Companies LLC to Edward Pawlowski (Massachusetts Department of Environmental Protection) and Joel Blumstein (EPA), attached as Exhibit B to the Declaration of Elizabeth A. Kudarauskas (Ex. 3).

[26] *See generally* EPA reporting requirements directed to Global Partners, dated November 2, 2011, and March 29, 2012, attached as Exhibit C to the Declaration of Elizabeth A. Kudarauskas (Ex. 3).

[27] *See* Notice of Violation, dated June 6, 2014, at 2, attached as Exhibit D to the Declaration of Elizabeth A. Kudarauskas (Ex. 3).

[28] *See generally* Notice of Violation, dated June 6, 2014, attached as Exhibit D to the Declaration of Elizabeth A. Kudarauskas (Ex. 3).

[29] *See* Notice of Violation, dated June 6, 2014, at 3, attached as Exhibit D to the Declaration of Elizabeth A. Kudarauskas (Ex. 3).

license from the Maine Department of Environmental Protection ("ME DEP") authorizing

Defendants to emit VOCs from the storage and distribution of No. 6 oil and asphalt at the

Facility.[30]  Under the ME SIP, as provided in the NOV, such a license would require a minimum

of BPT for these VOC emissions.[31]  The 2014 NOV also found that Defendants exceeded the

facility-wide VOC emissions limit in its existing State license for the Facility.[32]

Because Defendants' VOC emissions testing at the Facility revealed that the potential

emissions from the Facility's No. 6 oil and asphalt transfer, storage, and loading activities exceed

40 tons per year, EPA issued a second NOV in 2015, finding that the Facility also was subject to

and failed to comply with VOC RACT requirements in the ME SIP.[33]

Consistent with EPA's practices nationwide, at the time it issued the NOVs in 2014 and

2015, EPA provided copies to the state environmental agency, ME DEP, of the NOVs it had

issued to Defendants, as required by Section 113(a) of the Act, 42 U.S.C. § 7413(a) [34]  After

sending the NOVs to ME DEP, EPA also recorded the issuance of the NOVs on EPA's publicly

searchable database, Enforcement and Compliance History Online (also known as "ECHO").[35]

ECHO is a free, online, searchable database, currently available at http://echo.epa.gov, that

houses information about EPA's environmental enforcement activity nationwide.  And,

---

[30] *See id.*

[31] *See id.*

[32] *See id.*

[33] *See generally* Notice of Violation, dated April 7, 2015, attached as Exhibit D to the Declaration of Elizabeth A. Kudarauskas (Ex. 3).

[34] *See* Ex. 3 (Kudarauskas Decl.) at ¶ 14.

[35] *See id.*at ¶ 15.

consistent with the Act, the United States also gave Maine notice of the United States' Complaint against Global. [36]

### C.   **Complaint**

Based on Defendants' emissions testing data at the Facility, and Region 1's calculations of the potential to emit VOCs from the Facility, the United States alleges in the Complaint that Defendants violated the Act and the ME SIP.  The Complaint includes four counts:  Defendants violated, and continue to violate: (1) Chapter 115 of the ME SIP, by failing to obtain an emissions license addressing VOC emissions and failing to control VOC emissions by applying at a minimum BPT to the Facility's No. 6 oil and asphalt transfer, storage, and loading activities; (2) Chapter 115 of the ME SIP by failing to comply with the Facility's existing license by exceeding the existing license's VOC emissions limit; (3) Chapter 134 of the ME SIP by failing to comply with RACT requirements at the Facility because the Facility has the potential to emit VOCs at a level greater than 40 tons per year; and (4) Sections 502(a) and 503(c) of the Act, 42 U.S.C. §§ 7661a(a) and 7661b(c), by failing to obtain a Title V operating permit because the Facility is a major source of VOCs.[37]

### D.   **Litigation Costs and Risks**

As in any litigated matter, we expect that Defendants would challenge the United States' claims.  While we maintain the validity of the United States' claims, we recognize that there is risk and uncertainty if this case, as with any case, were to be litigated.  It is likely that the

---

[36] *See* Section 113(b), 42 U.S.C. § 7413(b).  *See also* Declaration of Patrick B. Bryan, attached hereto as Exhibit 5, at ¶¶ 2, 3.

[37] *See* Complaint Counts 1, 2, 3 and 4.

resolution of this matter would require the testimony of technical experts with specific knowledge relating to a number of specialized areas, including the design and function of heated petroleum storage tanks, the best methods for measuring actual and potential VOC emissions from such tanks, and the extent of environmental harm associated with such emissions.  Such expert-intensive litigation likely would result in a time-consuming proceeding that would consume Government resources, including the limited time of EPA enforcement staff, without any guarantee of the United States succeeding on the merits.

II.    **THE CONSENT DECREE**

After issuing the NOVs, EPA and Defendants discussed ways to address the VOC emissions discussed in the Complaint and to limit the potential for excess and unlicensed emissions in the future.  After lengthy settlement negotiations, in which each side was represented by experienced counsel and consulted with experts in the relevant technical areas, Defendants and EPA reached a resolution, the terms of which are reflected in the Consent Decree.

As discussed more fully below, the Consent Decree requires Defendants to perform injunctive relief and other measures, at an estimated cost to Defendants of $250,000,[38] spend at least $150,000 on a supplemental environmental project ("SEP") to improve local air quality, and pay a $40,000 civil penalty.  EPA estimates that Defendants' performance of these injunctive measures will result in a VOC reduction of 20 tons per year.[39]

---

[38] *See* Ex. 3 (Kudarauskas Decl.) at ¶ 11.

[39] *See* Ex. 3 (Kudarauskas Decl.) at ¶ 7.

If Defendants fail to meet any of the requirements of the Consent Decree, they would be subject to stipulated penalties.[40]

### A.   <u>Injunctive Relief and Other Measures</u>

The Consent Decree requires Defendants to implement the following measures to address past excess VOC emissions and limit future ones:

- <u>Heated tank limitations</u>:  Defendants will operate no more than four heated storage tanks containing either No. 6 oil or asphalt, no more than two of which may contain No. 6 oil simultaneously.[41]  Limiting the number of tanks that hold No. 6 oil and asphalt limits the potential VOC emissions from the Facility.[42]

- <u>Throughput limitations</u>:  Defendants will implement throughput limits for No. 6 oil of 50,000,000 gallons per rolling 12 months, and for asphalt of 75,000,000 gallons per rolling 12 months.[43]  Setting throughput limits for the Facility reduces the potential for VOC emissions associated with those products.[44]

- <u>Non-heating days</u>:  Defendants shall not apply heat to No. 6 oil and asphalt storage tanks at the Facility for at least 120 "non-heating days" during any 12-month rolling period.[45]  A "non-heating day" is any calendar day during which heat is not added to any such

---

[40] *See* Decree ¶¶ 30-42.

[41] *See* Decree ¶ 11.a.

[42] *See* Ex. 3 (Kudarauskas Decl.) at ¶ 4.

[43] *See* Decree at ¶ 11.c.

[44] *See* Ex. 3 (Kudarauskas Decl.) at ¶ 5.

[45] *See* Decree ¶ 11.b.

storage tank.[46]  Because heating the tanks above ambient temperatures increases VOC emissions, limiting the number of days during which Defendants may add heat to the No. 6 oil and asphalt storage tanks is a measure designed to reduce the potential for emissions of VOCs.[47]

- <u>License amendments</u>:  Defendants will submit to ME DEP an appropriate application for an amended state license for the Facility that incorporates terms at least as stringent as those referenced above.[48]

- <u>Supplemental measures</u>:  Defendants shall install equipment expected to reduce emissions from vapors from its Nov. 6 oil and asphalt heated storage tanks.[49]  Defendants have chosen to install mist eliminators to reduce local impacts of vapors, which may contain VOCs and odors.[50]  Defendants will operate and maintain mist eliminators on the Facility's heated storage tanks in accordance with the manufacturer's specifications.[51]  Global has informed EPA that the estimated cost of the implementation of mist eliminators required by the Consent Decree is approximately $250,000.[52]

Under the Consent Decree, Defendants will operate the Facility in accordance with the paragraphs above for the longer of (a) the term of the Consent Decree (at least five years) or

---

[46] *See* Decree ¶ 11.b.

[47] *See* Ex. 3 (Kudarauskas Decl.) at ¶ 6.

[48] *See* Decree at  ¶ 11.e.

[49] *See* Decree ¶ 11.d; Ex. 3 (Kudarauskas Decl.) at ¶ 11.

[50] *See* Decree ¶ 11.d; Ex. 3 (Kudarauskas Decl.) at ¶ 11.

[51] *See* Decree ¶ 11.d; Ex. 3 (Kudarauskas Decl.) at ¶ 11.

[52] *See* Ex. 3 (Kudarauskas Decl.) at ¶ 11

(b) the period from entry of the Consent Decree until Defendants obtain from the State a license

amendment with provisions at least as stringent as those of the Consent Decree. [53]

### B.   Supplemental Environmental Project

In addition to requiring Defendants to achieve and maintain compliance with the law and

regulations and to pay a civil penalty in this case, Defendants are also required to perform a

supplemental environmental project ("SEP").

Within two years after entry of the Consent Decree, Defendants must satisfactorily

complete a SEP involving a wood stove/boiler change-out program, to replace older residential

wood-burning stoves or boilers with updated, less polluting models.[54]  Defendants may

implement the SEP through a qualified non-profit organization approved by EPA.[55]  Defendants

must spend at least $150,000 to replace older wood stoves or boilers, exclusive of administrative

or other costs of the project.[56]  If Defendants fail to complete the SEP within two years after the

Court's entry of the Decree, they are subject to stipulated penalties on a daily basis.[57]

The SEP will benefit the local community's environment and otherwise comports with

EPA's SEP Policy.  The SEP has a relationship or "nexus" with a defendants' violations.[58]

---

[53] *See* Decree ¶ 11.f.

[54] *See* Decree ¶ 14.g.

[55] *See id.* ¶ 14.e.

[56] *See id.* ¶ 14.c.

[57] *Id.* at ¶ 34.

[58] *See* U.S.  Envtl.  Prot.  Agency, EPA Supplemental Environmental Projects Policy 7 (Mar.  10, 2015), available at https://www.epa.gov/enforcement/2015-update-1998-us-epa-supplemental-environmental-projects-policy.

Under the SEP policy, a project has a "nexus" to a violation if it reduces the public health or environmental impacts to which the violation contributes, or reduces the overall risk to public health or the environment potentially affected by the violations at issue.[59]  Older wood burning stoves or appliances tend to be relatively inefficient and to emit more VOCs and NOx than updated, less-polluting models.[60]  Both VOCs and $NO_x$ contribute to the formation of ozone, which can be harmful to human health.[61]  Thus, replacement and retrofit of older wood burning appliances and technologies reduce NOx and VOCs emissions and thus reduce ozone by addressing two of its precursors.[62]  These are the same public health impacts caused by VOC emissions from Defendants' facility.  Also, harmful particulate matter and hazardous air pollutants ("HAPs"), such as benzene, formaldehyde, acrolein, and polycyclic aromatic hydrocarbons, will be reduced through the project.[63]  All of these benefits will occur in Cumberland County, where South Portland is located.[64]

---

[59] See id. at 8.

[60] See U.S. Envtl. Prot. Agency, AP-42, Vol. 1, Ch. 1.10, Residential Wood Stoves, at 1.10.2, available at https://www3.epa.gov/ttn/chief/ap42/ch01/final/c01s10.pdf; see also U.S. Envtl. Prot. Agency, Final Rule, Standards of Performance for New Residential Wood Heaters, New Residential Hydronic Heaters, and Forced Air Furnaces, 80 Fed. Reg. 13,671, 13,673 (Mar. 16, 2015);  U.S. Envtl. Prot. Agency, Proposed Rule, Standards of Performance for New Residential Wood Heaters, New Residential Hydronic Heaters, and Forced Air Furnaces, and New Residential Masonry Heaters, 79 Fed. Reg. 6,329, 6,337 (Feb. 3, 2014).

[61] See Region 1: EPA New England – The Ozone Problem, available on EPA's website at https://www3.epa.gov/region1/airquality/oz_prob.html.

[62] See U.S. Envtl. Prot. Agency, Final Rule, Standards of Performance for New Residential Wood Heaters, New Residential Hydronic Heaters, and Forced Air Furnaces, 80 Fed. Reg. 13,671, 13,674-13,675 (Mar. 16, 2015).

[63] See U.S. Envtl. Prot. Agency, BurnWise, Wood Smoke and Your Health, available at https://www.epa.gov/burnwise/wood-smoke-and-your-health (identifying toxic air pollutants in wood smoke that are reduced when wood is burned more efficiently in an EPA-certified stove).

[64] See Decree ¶¶ 13-14.

C.      **Penalty**

The Consent Decree also requires Defendants to pay a civil penalty of $40,000, plus interest,[65] and is consistent with EPA's 1991 Clean Air Act Stationary Source Civil Penalty Policy.[66]  Among other things, the penalty reflects the seriousness of the violations while at the same time recognizing both the defendant's commitment to perform a valuable SEP[67] and the parties' respective assessments of the strengths and weaknesses of their litigation positions.

III.    **ARGUMENT**

A.      **Legal Standard for Approval of a Consent Decree**

"[I]t is the policy of the law to encourage settlements."  *United States v. Cannons Eng'g Corp.*, 899 F.2d 79, 84 (1st Cir. 1990) (citation omitted).  Indeed, in the First Circuit, there is "a strong public policy in favor of settlements, particularly in very complex and technical regulatory contexts."  *United States v. Comunidades Unidas Contra la Contaminacion*, 204 F.3d 275, 280 (1st Cir. 2000) (citing *Conservation Law Found. of New England, Inc. v. Franklin*, 989 F.2d 54, 59 (1st Cir. 1993)).  "Moreover, such a policy has added bite where the settlement has been advanced for entry as a decree by a government actor 'committed to the protection of the public

---

[65] *See* Decree ¶ 8.

[66] EPA's 1991 Clean Air Act Stationary Source Civil Penalty Policy is available publicly at https://www.epa.gov/enforcement/clean-air-act-stationary-source-civil-penalty-policy-october-25-1991.

[67] Under EPA's SEP policy, a violator's commitment to perform a SEP is a relevant factor for EPA to consider in establishing an appropriate settlement penalty.  *See* U.S.  Envtl.  Prot. Agency, EPA Supplemental Environmental Projects Policy 21-24 (Mar. 10, 2015), available at https://www.epa.gov/enforcement/2015-update-1998-us-epa-supplemental-environmental-projects-policy.  The civil penalty component of this settlement takes into account Defendants' commitment to perform the SEP, consistent with the SEP policy's requirements to ensure that the final penalty amount be sufficient both to "recoup[] the economic benefit a violator gained from noncompliance with the law," as well as to "reflect[] the environmental and regulatory harm caused by the violation(s)."  *Id.* at 21

14

interest' and specially trained and oriented in the field." *Comunidades Unidas*, 204 F.3d at 280 (citing *Cannons*, 899 F.2d at 84)).

With this backdrop, a district court reviews a consent decree to ensure that it is both procedurally and substantively fair, reasonable, and consistent with the objectives of the underlying statute. *See City of Bangor v. Citizens Commc'n Co.*, 532 F.3d 70, 93-94 (1st Cir. 2008); *see also Comunidades Unidas*, 204 F.3d at 279 ("There is no question that a consent decree must bear the imprimatur of a judicial judgment that it is fair, adequate, reasonable, and consistent with the objectives of Congress.") (citation omitted).  Although approval of a consent decree is a judicial act committed to the informed discretion of the district court, s*ee City of Bangor*, 532 F.3d at 93-94, the court's role is a limited one.  The relevant standard for the court's determination is "not whether the settlement is one which the court itself might have fashioned, or considers ideal, but whether the proposed decree is fair, reasonable, and faithful to the objectives of the government statute." *Cannons*, 899 F.2d at 84; *see also United States v. Colorado*, 937 F.2d 505, 509 (10 Cir. 1991) ("While the court may either approve or deny the issuance of a consent decree, generally it is not entitled to change the terms of the agreement stipulated to by the parties.") (citation omitted); *Harris v. Pernsley*, 654 F. Supp. 1042, 1049 (E.D. Pa. 1987) ("The court may either approve or disapprove the settlement; it may not rewrite it."), *aff'd* 820 F.2d 592 (3d. Cir. 1987).  The court's inquiry need not be all-encompassing and need not include protracted examination of the precise legal rights of the parties or resolve the merits of the claims.  *See In re Idaho Conservation League*, 811 F.3d 502, 515 (D.C. Cir. 2016) (noting that in approving a settlement, a trial court "need not inquire into the precise legal rights

15

of the parties nor reach and resolve the merits of the claims or controversy") (citations omitted);

*accord Comunidades Unidas*, 204 F.3d at 281 (citation omitted).

Not only should a district court's review of a consent decree be narrow in scope, it also "must defer heavily to the parties' agreement and the EPA's expertise." *United States v. Charles George Trucking, Inc.*, 34 F.3d 1081, 1085 (1st Cir. 1994). As the Supreme Court has stated:

> [S]ound policy would strongly lead us to decline . . . to assess the wisdom of the Government's judgment in negotiating and accepting the . . . consent decree, at least in the absence of any claim of bad faith or malfeasance on the part of the Government in so acting.

*Sam Fox Publ'g Co. v. United States,* 366 U.S. 683, 689 (1961).

"The presumption in favor of settlement is particularly strong where a consent decree has been negotiated by the Department of Justice on behalf of a federal administrative agency 'specially equipped, trained or oriented in the field,'" such as EPA. *United States v. Cannons Eng'g Corp*, 720 F. Supp. 1027, 1035 (D. Mass. 1989) (citation omitted), *aff'd*, 899 F.2d 79 (1st Cir. 1990). Accordingly, judicial review of a settlement agreement negotiated by the government does not involve de novo evaluation of the settlement's merits or "second guessing" the Executive Branch's decision to enter into a proposed settlement. *See Comunidades Unidas*, 204 F.3d at 280*; see also Cannons*, 899 F.2d at 84 (courts should "refrain from second-guessing the Executive Branch"); *see generally Sam Fox Publ'g Co.*, 366 U.S. at 689. Rather, in reviewing a settlement involving an agency, the court "must exercise some deference to the agency's determination that settlement is appropriate." *Conservation Law Found.,* 989 F.2d at 58 (*citing Fed. Trade Comm'n v. Standard Fin. Mgmt. Corp.*, 830 F.2d 404, 408 (1st Cir. 1987)). Moreover, the public policy in favor of the resolution of litigation by settlement is particularly strong in environmental cases. *See In re Acushnet River & New Bedford Harbor*, 712 F. Supp.

1019, 1029 (D. Mass. 1989) ("Congressional purpose is better served through settlements which provide funds to enhance environmental protection, rather than the expenditure of limited resources on protracted litigation.").

Deference should also be granted to entry of consent decrees with the federal government because it is an official act of the Attorney General, who has "exclusive authority and plenary power to control the conduct of litigation in which the United States is involved, unless Congress specially authorizes an agency to proceed without the supervision of the Attorney General." *United States v. Hercules, Inc.*, 961 F.2d 796, 798 (8th Cir. 1992) (citing 28 U.S.C. § 516; *FTC v. Guignon*, 390 F.2d 323, 324 (8th Cir. 1968)). This authority places considerable discretion in the hands of the Attorney General to decide whether, and on what terms, to enter into a settlement. *See Hercules*, 961 F.2d at 798 (citing *Swift & Co. v. United States*, 276 U.S. 311, 331-32 (1928)); *see also Cannons*, 899 F.2d at 84 (noting that the presumption in favor of voluntary settlements is "particularly strong where a consent decree has been negotiated by the Department of Justice on behalf of a federal administrative agency"); *Kelley v. Thomas Solvent Co.*, 717 F.Supp. 507, 515-16 (W.D. Mich. 1989) ("the balancing of competing interests affected by a proposed consent decree [to which the government is a party] 'must be left, in the first instance, to the discretion of the Attorney General.'" (*quoting United States v. Bechtel Corp.*, 648 F.2d 660, 666 (9th Cir. 1981))). The district court, however, must ensure that the consent decree "is not illegal, a product of collusion, or against the public interest." *Colorado*, 937 F.2d at 509. Only a finding that the Decree is a product of "fraud, collusion, or the like" should preclude its entry. *Cotton v. Hinton*, 559 F.2d 1326, 1330 (5th Cir. 1977); *see Sam Fox Publ'g*, 366 U.S. at 689 (noting the sound policy of deferring to the Government's judgment in

17

fashioning the consent decree "in the absence of any claim of bad faith or malfeasance on the part of the Government in so acting.").

In sum, the Court's role in reviewing the proposed Consent Decree is relatively limited. If the consent decree is fair, adequate, and reasonable, and not illegal, the product of collusion, or against the public interest, it ought to be approved without modification. Moreover, in determining whether the proposed Consent Decree ought to be approved, the Court should defer to EPA's expertise in protecting human health and the environment through implementation of the Clean Air Act requirements, and to the Attorney General's expertise in conducting government litigation, assessing litigation risk, and determining whether settlement terms are in the public interest.

As demonstrated below, the proposed Consent Decree meets the three prongs necessary for district court approval of a settlement: it is fair, reasonable, and faithful to the objectives of the Act.

      **B.**      <u>**The Decree Is Reasonable, Fair, and Consistent with the Act.**</u>

          *1.*      *The Consent Decree is Fair.*

The fairness of a consent decree must be evaluated in both procedural and substantive aspects. *See Cannons*, 899 F.2d at 86 (explaining that "fairness in the … settlement context has both procedural and substantive components).

Procedural fairness demands that the parties negotiated at arm's length and in good faith. *United States v. Davis*, 261 F.3d 1, 23 (1st Cir. 2001); *Comunidades Unidas*, 204 F.3d at 281. Procedural fairness is measured by the level of candor, openness, and bargaining balance involved in the negotiation process. *See Cannons*, 899 F.2d at 86.

Substantive fairness is related to procedural fairness because "[t]o the extent that the process was fair and full of 'adversarial vigor,' the results come before the court with a much greater assurance of substantive fairness." *Cannons*, 899 F.2d at 87 n.4 (internal citation omitted). Substantive fairness derives from concepts of corrective justice and accountability: how much or how little should a settling party be expected to do or pay in order to correct environmental wrongs? *Comunidades Unidas*, 204 F.3d at 281. Because these concepts are not easily quantified in environmental cases, EPA's expertise and conclusions receive "the benefit of doubt when weighing fairness." *Cannons*, 899 F.2d at 88; *City of Bangor*, 532 F.3d at 97 ("Usually, there is deference to the EPA's judgment on fairness, and no independent court inquiry.").

The proposed Consent Decree resulted from procedurally fair settlement negotiations. The negotiations were conducted at arms-length, and continued for a lengthy period of time, culminating in the lodging of the proposed Consent Decree with the Court. The parties engaged in contentious and extensive negotiations concerning the terms of the Consent Decree, including the injunctive relief that Defendants have agreed to perform. Throughout the entirety of this lengthy process, each side was represented by experienced counsel, and expert consultants with technical and engineering experience participated in the negotiations. There is no evidence that the parties proceeded other than in good faith.[68] The Decree reflects the parties' careful and

---

[68] As discussed more fully in the Responsiveness Summary, some commenters complain that the penalty, SEP, and injunctive relief measures contained in the Decree show that the United States "has the backs of big oil," questioning the motives or manner in which the United States entered into a settlement with Defendants. *See* Ex. 1 at PC_001, 005, 029-30, 096). But bare accusations of wrongdoing, without specifics or otherwise pointing to particular record references, are not enough to upset an EPA consent decree. *See Comunidades Unidas*, 204 F.3d at 281 (citing *United States v. District of Columbia*, 933 F.Supp. 42, 48-49 (D.D.C. 1996)). Furthermore, the Decree achieves real reductions in VOC emissions that will benefit the environment. *See* Ex. 3 (Kudarauskas Decl.) at ¶ 7.

informed assessment of how to bring Defendants into compliance with the Act.  Where, as here, a proposed consent decree is "the product of good faith, arms-length negotiations," it is "presumptively valid."  *United States v. Oregon*, 913 F.2d 576, 581 (9th Cir. 1990) (citation omitted).  And, "[t]he presumption in favor of settlement is particularly strong where a consent decree has been negotiated by the Department of Justice on behalf of a federal administrative agency specially equipped, trained or oriented in the field," such as EPA.  *Cannons*, 720 F. Supp. at 1035.  Additionally, as with any fair settlement, both the United States and Defendants are resolving the alleged violations without further costs and delays associated with litigation. *Davis*, 261 F.3d at 26 (noting that a consent decree may take into account "reasonable discounts for litigation risks, time savings, and the like that may be justified").  For these reasons, the Decree is procedurally fair.

The Consent Decree also is substantively fair.  EPA estimates the Consent Decree will result in a VOC reduction of about 20 tons per year at the Global facility.[69]  The Decree also provides additional benefits to the air quality of the local area through Defendants' performance of the SEP.  And the civil penalty, together with the significant costs associated with Defendants' performance under the Decree, including the SEP, serves to deter others from polluting the air in violation of the Act.  Moreover, Defendants are also subject to stipulated penalties for not complying with the Decree's obligations, which should deter future violations.  Thus, the Decree is fair and reflects EPA's careful technical and environmental assessment, and any benefit of the doubt should be resolved in EPA's favor.  *Cannons*, 899 F.2d at 88; *City of Bangor*, 532 F.3d at

---

[69] *See* Ex. 3 (Kudarauskas Decl.) at ¶ 7.

97 ("Usually, there is deference to the EPA's judgment on fairness, and no independent court inquiry.").[70]

### 2.     The Consent Decree is Reasonable.

The reasonableness of a proposed consent decree depends on how well the relief is tailored to redress the injuries alleged in the complaint. *Comunidades Unidas*, 204 F.3d at 281. Courts need not examine the reasonableness of proposed consent decrees for "mathematical precision," but should defer to the EPA's judgment on whether the decree is reasonable. *Davis*, 261 F.3d at 26. The reasonableness of an environmental consent decree may be determined in light of whether it is technically adequate to cleanse the environment and takes into account the risks of litigation. *Cannons*, 899 F.2d at 89-90. In assessing a decree's reasonableness, courts holistically review the relief sought. *See United States v. District of Columbia*, 933 F. Supp. 42, 51 (D.D.C. 1996) (finding a decree reasonable, even though United States had made a "conscious decision not to seek penalties"); *United States v. Kerr-McGee Corp.*, No. 07-CV-01034, 2008 WL 863975, at *9 (D. Colo. Mar. 26, 2008) (reviewing a consent decree as a whole

---

[70]  As discussed more fully in the attached Responsiveness Summary addressing the public comments, commenters expressed frustration that the City of South Portland (and perhaps other entities) were not involved in the settlement negotiations with Defendants. As the First Circuit has held, the United States is generally not required to negotiate environmental consent decrees in public.

> [T]he government is under no obligation to telegraph its settlement offers, divulge its negotiating strategy in advance, or surrender the normal prerogatives of strategic flexibility which any negotiator cherishes…. So long as it operates in good faith, the EPA is at liberty to negotiate and settle with whomever it chooses.

*United States v. Cannons Eng'g Corp.*, 899 F.2d 79, 93 (1st Cir. 1990). *See also United States v. Comunidades Unidas Contra La Contaminacion*, 204 F.3d 275, 277 (1st Cir. 2000) (court rejected objections to a settlement based upon lack of participation by intervener in negotiations); *United States v. Town of Moreau, New York*, 979 F. Supp. 129, 135 (N.D.N.Y. 1997) *aff'd sub. nom. United States v. Glens Falls Newspapers, Inc.*, 160 F.3d 853 (2d. Cir. 1998) ("it is doubtful that a public settlement conference would ever permit the type of give and take that would lead to an agreed resolution of the dispute.").

and concluding that the "relatively modest civil penalty assessment is counterbalanced by its

injunctive provisions") (citation omitted).

      As detailed above, the Decree is reasonable and technically adequate because it requires

specific, tailored corrective actions that Defendants must take to address the violations identified

in the Complaint.  Defendants must implement injunctive relief measures (at an estimated cost to

Defendants of $250,000), [71] perform a SEP to improve local air quality (which will cost

Defendants no less than $150,000), and pay a $40,000 civil penalty.  The Decree will help

cleanse the environment, resulting in a VOC reduction of about 20 tons per year at the Global

facility.[72]

      Settlement of this matter also reflects the risks of litigation and "the policy of the law to

encourage settlements."  *Cannons*, 899 F.2d at 84 (1st Cir. 1990); *see also Comunidades Unidas*,

204 F.3d at 280 (noting "the strong public policy in favor of settlements, particularly in very

complex and regulatory contexts").  "It is almost axiomatic that voluntary compliance on an

issue where there is a potential disagreement is a better alternative than the uncertainty of

litigation over that issue."  *District of Columbia*, 933 F. Supp. at 51.  That this is a case that

likely would require a battle of experts emphasizes the reasonableness of the proposed Decree as

an alternative to costly and uncertain litigation.

---

[71] *See* Ex. 3 (Kudarauskas Decl.) at ¶ 11.

[72] *See id.* at ¶ 7.

### 3.    The Consent Decree Advances the Act's Goals.

The Decree also advances the Act's goals.  Congress passed the Act "to protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare and the productive capacity of its population."[73]  The Consent Decree furthers these objectives by requiring Defendants to take specific steps to minimize emissions that are harmful to human health and the environment from the Facility, resulting in less tonnage of VOC emissions per year.  EPA acted when it perceived Defendants to be in violation of the ME SIP and the Act, even though the case presented technical challenges and litigation risk.  "Congressional purpose is better served through settlements which provide funds to enhance environmental protection, rather than the expenditure of limited resources on protracted litigation."  *In re Acushnet River*, 712 F. Supp. At 1029.  The proposed Decree is consistent with the Act's goals, and the Court should enter it as a final judgment in this matter.  *See Charles George Trucking*, 34 F.3d at 1085 (district court "must defer heavily to the parties' agreement and the EPA's expertise").

**C.    The Comments Received During the Period for Public Comment Do Not Warrant Disapproval of the Consent Decree.**

The United States received approximately 90 comments during the public comment period.  The United States has carefully considered the comments and addressed them in detail in the Responsiveness Summary, attached hereto as Exhibit 2.  The comments indicate that residents of South Portland are concerned about the potential for adverse health and environmental impacts in connection with Defendants' Facility and other petroleum tank farms in the South Portland area.  The United States appreciates the importance of these concerns and

---

[73] Section 101(b)(1), 42 U.S.C. § 7401(b)(1).

23

the active participation of the public in commenting on the proposed Decree.  However, the comments do not disclose facts or considerations that indicate that the proposed judgment is inappropriate, improper, or inadequate.  The commenters' key concerns (odors and health impacts) are outside the specific pollutant problem that is the focus of this case.  And the residents have been heard as local and state authorities have taken action through initiation of a monitoring program[74] and passing legislation requiring the state agency to share information about air violations with communities.[75]

Although the Responsiveness Summary addresses these points at greater length, for ease of reference, the United States highlights three of the more common comments here.

First, many commenters are concerned about the local impacts of odors and possible hazardous air pollutants ("HAPs") on the community.  While local concerns are important, they go beyond the limited scope of the Complaint.  As discussed previously, the specific concern addressed by the laws and regulations at issue in the Complaint is the formation of ground-level ozone that may occur as a result of VOC emissions.[76]  Ozone is one of six principal pollutants for which EPA has set NAAQS that apply in Maine and nationally.[77]  Thus, the United States

---

[74] *See* Press Release, "South Portland Partners With ME DEP for Air Quality Monitoring," May 30, 2019, available at https://www.southportland.org/files/4015/5931/4906/Press_Release_-_DEP_Air_Quality_Monitoring_053019.pdf.

[75] *See generally* https://www.maine.gov/governor/mills/news/governor-mills-signs-bills-law-2019-06-17 ("An Act To Ensure Public Notifications of Air Violations"); "Mills Signs Bill Requiring State To Alert Communities To Federal Air Quality Violations," Portland Press Herald, June 18, 2019 (updated June 19, 2019), by Scott Thistle, available at https://www.pressherald.com/2019/06/18/mills-signs-bill-requiring-state-to-notify-cities-of-federal-air-quality-violations/.

[76]  *See* Ex. 3 (Kudarauskas Decl.) at ¶ 2.

[77] *See* Criteria Air Pollutants, available on EPA's website at https://www.epa.gov/criteria-air-pollutants.

asserts claims in the Complaint under the ME SIP to address excess and unlicensed VOC emissions at the Facility, which affect the potential for ozone formation in the area.  The Decree, accordingly, calls for Defendants to take measures designed to limit VOC emissions at its Facility, and to obtain appropriate license conditions governing the VOC emissions to address the threat to ground-level ozone levels in the area.  Likewise, the focus of the SEP is to reduce ozone (by reducing its precursors, NOx and VOCs) in the local area.

Although the Complaint does not address odors, as part of the settlement, Global will install mist eliminators to reduce local impacts of vapors, which may contain VOCs and odors.[78] Global will operate and maintain mist eliminators on the heated storage tanks at the Facility in accordance with the manufacturer's specifications.[79]

Further, the Complaint does not address HAPs, which are regulated under a separate CAA regulatory program.[80]  Unlike ozone, EPA regulates HAPs under Section 112 of the Act, 42 U.S.C. § 7412, and the National Emissions Standards for Hazardous Air Pollutants ("NESHAP") program, which are not at issue in this action.  Thus, comments that the Decree does not do enough to combat odors and health risks associated with HAPs and other air toxics are beyond the scope of this case.

Second, several commenters expressed concern that the Consent Decree does not include an ambient or fence-line air monitoring program – either as a SEP or otherwise as part of the

---

[78] *See* Decree ¶ 11.d; Ex. 3 (Kudarauskas Decl.) at  ¶ 11.

[79] *See* Decree ¶ 11.d; Ex. 3 (Kudarauskas Decl.) at  ¶ 11.

[80] Under the current air emissions limit of 9.9 tons per year of HAPs, the Facility cannot operate as a major source of HAPs and so is not subject to CAA requirements for major source HAPs.  *See* Ex. 3 (Kudarauskas Decl.) at ¶ 10.

injunctive relief.  This, too, is not a valid basis to deny entry of the Decree.  The Act does not

require the implementation or funding of an air monitoring program to redress the violations at

issue.  Moreover, SEPs are programs that a defendant takes voluntarily as part of a settlement to

perform measures beyond what could be obtained through a court order to return a defendant to

compliance.  A defendant cannot be compelled to adopt a particular project as a SEP.   Hence,

any objection that the Decree should require the Defendants to perform air monitoring cannot

serve to defeat entry of the Decree.  In the public comment it submitted regarding the Decree,

ME DEP suggested that a citywide air monitoring program should be included in the Decree as a

SEP instead of a wood-stove SEP.[81]  As discussed in the attached Responsiveness Summary,

since the date when ME DEP submitted its comment on the Decree, the City of South Portland

announced that it and ME DEP have begun implementation of such an air monitoring program.[82]

     Third, commenters say that the City of South Portland did not receive sufficient notice of

Defendants' violations.  As discussed in more detail in the Responsiveness Summary, although it

was not legally required to provide notice to the City of South Portland, EPA, in fact, discussed

the NOVs with the City.  In 2016, during a meeting with the City of South Portland to discuss a

proposed ambient air monitoring program that EPA was seeking to fund through a grant, an

employee of EPA provided the City Manager at the time with information on EPA's CAA

enforcement efforts in the area, including that EPA had issued four NOVs in connection with

---

[81] *See* Ex. 1 at PC _031-032.

[82] *See* Press Release, "South Portland Partners With ME DEP for Air Quality Monitoring," May 30, 2019, available
at https://www.southportland.org/files/4015/5931/4906/Press_Release_-
_DEP_Air_Quality_Monitoring_053019.pdf.

storage of petroleum products in South Portland.[83]  Two of these NOVs related to Defendants'

operations that form the basis of the Complaint in this action.[84]  And, as discussed previously,

EPA recorded the issuance of the NOVs to Defendants on the ECHO database, available to the

public online.[85]

## IV.  <u>CONCLUSION</u>

Because the Consent Decree is fair, reasonable, and consistent with the goals of the Act,

the United States respectfully requests that the Consent Decree be entered as an order of the

Court.

                                      Respectfully Submitted,

                                      ELLEN M. MAHAN
                                      Deputy Section Chief
                                      Environmental Enforcement Section
                                      Environment and Natural Resources Division
                                      U.S. Department of Justice

<u>October 15, 2019</u>                    */s/ Patrick B. Bryan*
Dated                                  PATRICK B. BRYAN
                                      Trial Attorney
                                      DAVID L. WEIGERT
                                      Senior Counsel
                                      Environmental Enforcement Section
                                      Environment and Natural Resources Division
                                      U.S. Department of Justice
                                      P.O. Box 7611
                                      Washington, D.C.  20044-7611
                                      (202) 616-8299 (PBB)
                                      (202) 514-0133 (DLW)
                                      patrick.bryan@usdoj.gov
                                      david.weigert@usdoj.gov

---

[83] *See* Declaration of Patrick Bird, attached as Exhibit 4, at ¶ 6.

[84]  *See* Ex. 3 (Kudarauskas Decl.) at ¶ 14.

[85] *See id.* at ¶ 15.

27

HALSEY B. FRANK
United States Attorney
District of Maine

JOHN G. OSBORN
Chief, Civil Division
U.S. Attorney's Office, District of Maine
100 Middle Street Plaza
East Tower, Sixth Floor
Portland, Maine 04101
(207) 780-3257
john.osborn2@usdoj.gov

OF COUNSEL:

THOMAS OLIVIER
U.S. EPA, Region 1
5 Post Office Square
Suite 100 (Mail Code OES 04-4)
Boston, MA 02109-3912

28

## CERTIFICATE OF FILING

I certify that on October 15, 2019, I electronically filed the foregoing United States'

Consented-To Motion To Enter Consent Decree With Incorporated Memorandum Of Law.

Notice of this filing will be sent by e-mail to counsel of record by operation of the Court's

electronic filing system.  Parties may access this filing through the Court's system.

*/s/ Patrick B. Bryan*
PATRICK B. BRYAN
Trial Attorney
U.S. Department of Justice
Environment and Natural Resources Division
Environmental Enforcement Section
P.O. Box 7611
Washington, DC 20044-7611
Tel.: 202-616-8299
Email: Patrick.Bryan@usdoj.gov