UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　Plaintiff,<br><br>v.<br><br>GLOBAL PARTNERS LP<br>GLOBAL COMPANIES LLC<br>CHELSEA SANDWICH LLC,<br><br>　　　Defendants. | Case No. 2:19-CV-122-DBH |

**DEFENDANTS' RESPONSE TO PROCEDURAL ORDER**

Defendants Global Partners LP, Global Companies LLC, and Chelsea Sandwich LLC submit this response to address the three issues raised by the Court in its October 31, 2019 Procedural Order.

**A.    Background**

The proposed Consent Decree is the result of an over four-year process, as detailed below, which began when the United States Environmental Protection Agency ("EPA") issued a notice of violation in 2014 alleging violations of the Maine state implementation plan of the Clean Air Act.  A lengthy negotiation ensued involving experienced counsel for both sides, extensive data analysis, and over 40 telephone calls and in-person meetings.

The Complaint, filed in March 2019, raised concerns about "the formation of ground-level ozone that may occur as a result of excess or unlicensed emissions of volatile organic compounds."  (ECF 19 at 2).  The remedies required in the ensuing Consent Decree—which itself was also heavily negotiated—have a close nexus to these concerns.  In October 2019, after an extended public comment period, the United States moved to enter the Consent Decree. Defendants assented to this motion.

**B.     Response to Issues Raised in Procedural Order**

*1.     Procedural Fairness*

The Court first asks whether the record should contain more information for it to consider in assessing the procedural fairness of the consent decree. (ECF 20 at 3-4). "Fairness should be evaluated from the standpoint of signatories …" *United States v. Akzo Coatings of Am., Inc.*, 949 F.2d 1409, 1435 (6th Cir. 1991) (internal citation and quotation omitted);[1] *United States. v. Gen. Elec. Co.*, 460 F. Supp. 2d 395, 402 (N.D.N.Y. 2006), *aff'd sub nom. Town of Ft. Edward v. United States*, 06-5535-CV, 2008 WL 45416 (2d Cir. Jan. 3, 2008) (Finding a consent decree was procedurally fair, in part, based on the bargaining balance of the parties and lack of "indication that there was any flaw in the negotiation process that would render it procedurally unfair."). In doing so, courts have considered "the strength of plaintiff's case, the good faith efforts of the negotiators, the opinions of counsel, and the possible risks involved in the litigation if the settlement is not approved." *Akzo Coatings*, 949 F.2d at 1435 (internal citation and quotation omitted).

Defendants submit that the information filed by the United States in its assented-to Motion to Enter (ECF No. 19) sufficiently shows that the proceeding was procedurally fair. As the United States wrote, the "negotiations were conducted at arms-length," and "each side was represented by experienced counsel, and expert consultants with technical and engineering experience participated in the negotiations." (*Id.* at 19). And the "Decree reflects the parties' careful and informed assessment of how to bring Defendants into compliance with the Act." (*Id.* at 19-20). Further, "[t]here is no indication that there was any flaw in the negotiation process

---

[1] *Akzo Coatings* also considered the fairness to non-settling potentially liable parties in the unique context of a CERCLA action, which is inapplicable here.

Defendants' Response to Procedural Order - Page 2

that would render it procedurally unfair [and t]here is no reason to speculate that the parties were anything but candid and open throughout the negotiations." *General Electric*, 460 F. Supp. 2d at 402. Accordingly, Defendants assert that actions taken in connection with the Consent Decree reflect "procedural fairness."

To further assist the Court in its understanding of the highly contested context of this matter and the lengthy and detailed negotiations of the settlement that resulted in the Consent Decree, Defendants submit the following additional information:

- The parties negotiated this matter over a four-year period, which involved at least four in-person meetings and about 40 telephone calls (counsel for the Defendants participated in all of these communications).

- Both parties were represented by experienced counsel well versed in Clean Air Act proceedings. During much of the negotiations, the United States was represented by two senior EPA counsel and sometimes two Department of Justice attorneys, while Defendants were represented by two outside counsel, supported by in-house counsel.

- EPA staff from the Regional Office and D.C. Headquarters participated extensively in the negotiations, as did Defendants' Vice President of Environment, Health and Safety.

- Both parties engaged outside experts with expertise in air pollution control and emissions testing and data analysis to participate in technical discussions.

Based on these years of negotiations, and their review and analysis of the data, Defendants maintain their position that they do not admit liability for the issues contained in the Complaint. Among other reasons, Defendants and their technical experts have from the outset disputed the sampling protocol and resulting data that is at the root of the allegations in the

Defendants' Response to Procedural Order - Page 3

Complaint.  Defendants believe that this flawed sampling protocol substantially inflated the potential emissions from the facility and do not reflect actual conditions or operations at the facility.  Further, Defendants continue to maintain that the facility's current air emissions license applies to all emissions the United States raised in its Complaint.  Defendants have also argued that the facility's total emissions, calculated using industry standard methods rather than the flawed sampling protocol, never exceeded the facility's license limit.  Defendants believe that the United States is incorrect in its allegation that the facility has the potential to exceed these licensed limits.

Nevertheless, Defendants recognize that all litigation is uncertain.  The defense of this action would involve significant costs, even if Defendants prevailed.  To achieve closure in this matter (despite Defendants never having exceeded its current emission limits) and to avoid further expense, Defendants have agreed to resolve the United States' allegations through entry of the Consent Decree, despite Defendants' belief that they would prevail in any contested enforcement action brought by the United States.

The Consent Decree itself was heavily negotiated, with both sides moving from their initial offers.  The parties exchanged several iterations of a term sheet over a lengthy period.  Once the parties agreed upon the key terms, the parties exchanged numerous drafts of the Consent Decree.  Key factors and terms that were negotiated include the nature and details of operational limitations, the nature of the controls to be required, the penalty amount, the calculation of the target emissions reduction, and the specific terms and amount of the supplemental environmental project.

In sum, the parties conducted the negotiations at arms' length and from an adversarial (but collegial and professional) posture over the course of more than four years.  Defendants believe that the proposed Consent Decree is a fair and reasonable compromise of this matter.

### 2. *Actions Taken by State and Local Authorities*

The Court next asks whether there is "legal authority supporting the argument that . . . voluntary actions by others are relevant to [its] assessment of the proposed consent decree and its scope." (ECF No. 20 at 4). In this instance, by assenting to the Motion to Enter, Defendants understood that references to the City of South Portland and the Maine Department of Environmental Protection and their ongoing activities with respect to the Defendants' operations were not intended to bear legal relevance to the Court's determination of the Motion to Enter. The information was offered only to place the Consent Decree into the context of other local and state entities' authorities to further regulate Defendants' operations and the abilities of those bodies to consider issues outside the scope of this proceeding that were raised by commenters. For example, in addressing public comments, the United States notes that the "commenters' key concerns (odors and health impacts) are outside the specific pollutant problem that is the focus of this case." (ECF 19 at 23-24). The United States then continues by claiming that local and state authorities are addressing these separate concerns "through initiation of a monitoring program and passing legislation requiring the state agency to share information about air violations with communities." (*Id.* at 24).

In this matter, the Maine Department of Environmental Protection ("MEDEP") did not intervene or participate in the enforcement action. As noted in the pleadings, the action commenced by the United States seeks to enforce provisions of the MEDEP regulations. While the terms of the Consent Decree remain independently enforceable regardless of subsequent action or inaction by the MEDEP, the Consent Decree requires that Defendants pursue revisions to the MEDEP Air License to reflect the operating controls required in the Consent Decree.

### 3. *Procedures and Burden of Proof*

The Court's final questions concern the section on procedures and burden of proof for

Defendants' Response to Procedural Order - Page 5

enforcing the Consent Decree.  This section does not affect the Court's contempt power and standards for its exercise.  Rather, it governs only the manner and procedures with which the parties may allege a violation of the Consent Decree.  This section also provides clarification on what would be deemed a violation.  Such provisions promote judicial economy and conserve party resources by having the standards clearly defined in advance.  Similar provisions were included in the approved consent decree in *United States et al. v. City of Bangor, Maine*, No. 1:15-cv-00350-NT, ECF 7 (Nov. 13, 2015).

      For these reasons, and those in the United States' underlying motion, Defendants request that the Court approve the Consent Decree.

          Respectfully submitted,

          GLOBAL PARTNERS LP
          GLOBAL COMPANIES LLC
          CHELSEA SANDWICH LLC

          /s/Michael A. Leon
          By: Michael A. Leon (admitted *pro hac vice*)
          NUTTER, McCLENNEN & FISH, LLP
          World Trade Center West
          155 Seaport Boulevard
          Boston, MA  02210
          (617) 439-2000
          mleon@nutter.com

          David B. Van Slyke (Bar No. 7333)
          PRETI, FLAHERTY, BELIVEAU & PACHIOS, LLP
          One City Center
          P.O. Box 9546
          Portland, ME 04112
          791-3000
          dvanslyke@preti.com

November 20, 2019

## **CERTIFICATE OF SERVICE**

      I hereby certify that on November 20, 2019, a copy of the foregoing document was served upon the United States through the Court's ECF filing system.

                                                    /s/Michael A. Leon
                                                  Michael A. Leon

4657542.11