# UNITED STATES DISTRICT COURT

# DISTRICT OF MAINE

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | CIVIL NO. 2:19-CV-122-DBH |
| | ) | |
| **GLOBAL PARTNERS LP, ET AL.,** | ) | |
| | ) | |
| Defendant | ) | |

## MEMORANDUM DECISION GRANTING MOTION
## TO ENTER CONSENT DECREE

This is a case about emissions of smog-causing compounds from a petroleum storage site in South Portland. The federal government and the site owners have agreed to settle their dispute and have proposed a consent decree for which they seek court approval. South Portland's local government and residents widely criticized the proposed decree during an extended public comment period, but no one has moved to intervene in this lawsuit, and the criticisms generally relate to matters outside the scope of the complaint that the government filed in court against the defendants. As the executive branch, the government has full control over what legal proceedings to bring, and as a judge, I must measure the settlement and proposed decree against the scope of the complaint the government actually filed, not against what it could have or perhaps should have done. See SEC v. Citigroup Glob. Mkts., Inc., 752 F.3d 285, 297 (2d Cir. 2014) ("To the extent the district court withheld approval of the consent decree on the ground that it believed the S.E.C. failed to bring the proper

charges against Citigroup, that constituted an abuse of discretion. . . .  The exclusive right to choose which charges to levy against a defendant rests with the S.E.C."); United States v. Davis, 261 F.3d 1, 22 (1st Cir. 2001) ("[A] consent decree must . . . come within the general scope of the case based on the pleadings."); see generally Brandon L. Garrett, *The Public Interest in Corporate Settlements*, 58 B.C. L. Rev. 1483, 1514-16 (2017).  I conclude that I must **GRANT** the motion to enter the consent decree.

**BACKGROUND**

On March 25, 2019, the United States, on behalf of the Environmental Protection Agency (I will call the government or plaintiff the EPA), filed in this court a complaint against the defendants (I will call them collectively Global).  Compl. (ECF No. 1).  Global owns and operates a petroleum storage facility in South Portland.  The EPA's complaint says that Global failed to comply with several licensing and emission requirements for volatile organic compounds (VOCs) that come out of its storage tanks or its transfer of petroleum products.  VOCs react with nitrogen oxides in sunlight to produce ground-level ozone, a pollutant that contributes to smog.  EPA, *Ground-level Ozone Basics*, https://www.epa.gov/ground-level-ozone-pollution/ground-level-ozone-basics (last visited Dec. 19, 2019).  Because VOCs have unhealthy effects, the EPA and state authorities try to control them using the Clean Air Act, 42 U.S.C. § 7401 et seq.

Here is the legal framework.  Under the Clean Air Act, Maine has created a state implementation plan (the jargon is "SIP," but there are enough other acronyms in this lawsuit, so I will call it the "Plan") that limits VOC emissions,

and the EPA approved it.[1]  See *EPA Approved Regulations in the Maine SIP*, https://www.epa.gov/sips-me/epa-approved-regulations-maine-sip (last visited Dec. 19, 2019)[2]; 42 U.S.C. § 7410 (provision of the Clean Air Act concerning state implementation plans).  Maine's Plan prohibits any VOC emission without a license.  Me. Plan Ch. 115 § II.  To obtain a license, an entity must demonstrate that its air emissions are receiving the "best practical treatment," id. § V(A)(2)(a), which means that the entity is reducing its emissions to the lowest level possible given existing technology, the effectiveness of alternative methods, and economic feasibility, id. Ch. 100(19).  Any facility that has the potential to emit at least 40 tons of VOCs per year must comply with additional "reasonably available control technology" requirements to limit its VOC emissions.  Id. Ch. 134.  Finally, an entity that is a "major source" of air pollution—meaning it is subject to certain federal regulations and has the potential to emit at least 50 tons of VOCs per year, id. Ch. 100(78)—must obtain what is known as a Part 70 license (also called a Title V operating permit).  Id. Ch. 140 (laying out details of Part 70 licensing program); 40 C.F.R § 70.5 (requiring major sources to apply for the license).

In 2014, the EPA informed Global that its South Portland facility was a "major source" of air pollution and it therefore had to obtain a Title V operating permit.[3]  June 6, 2014, Notice of Violation, Kudarauskas Decl. Ex. D at 63 ¶ 15

---

[1] The EPA can enforce the state's plan.  42 U.S.C. § 7413(b).

[2] Throughout its filings, the EPA cites the federally approved versions of the Maine Plan, which are found on the EPA's website at the address in text.  The Maine DEP also publishes these rules on its website, see Me. DEP, *Air Rules*, https://www.maine.gov/dep/air/rules/index.html (last visited Dec. 19, 2019), but they are numbered and arranged differently.  To remain consistent with the EPA filings, I use the numbering found on the EPA's website.

[3] The EPA learned about the emissions at the South Portland facility from Global itself.  After Global disclosed elevated VOC emissions from tanks it owns in Chelsea, Massachusetts, the EPA

(ECF No. 19-3). The EPA said Global was also exceeding the VOC emissions limit contained in its existing Maine license and failing to apply "best practical treatment" to its emissions. Id. at 63 ¶¶ 16-17. The following year, the EPA issued a second notice finding that the South Portland facility was subject to and failing to follow the "reasonably available control technology" requirements. April 7, 2015, Notice of Violation, Kudarauskas Decl. Ex. D at 66 (ECF No. 19-3).

On March 25, 2019, the EPA filed in this court a four-count complaint alleging that Global violated: (1) Chapter 115 of the Maine Plan by failing to obtain a license for its VOC emissions and failing to control VOC emissions by applying "best practical treatment"; (2) Chapter 115 of the Plan by exceeding the VOC emissions limit of its existing license; (3) Chapter 134 of the Plan by failing to comply with the "reasonably available control technology" requirements; and (4) Sections 502(a) and 503(c) of the Clean Air Act, 42 U.S.C. §§ 7661a(a) and 7661b(c), by failing to obtain a Title V operating permit even though the facility was a "major source" of VOCs.

On the same day it filed its complaint, the EPA also filed a proposed consent decree. The decree, to which Global consented, would require Global to pay a $40,000 penalty, follow a variety of new requirements aimed at reducing VOC emissions, apply for an amended VOC license from the Maine Department of Environmental Protection, and spend at least $150,000 on "a supplemental environmental project" to improve local air quality by replacing residential wood-

---

required it to conduct emissions testing at one of its other facilities. Gov't Consent Mot. to Enter Consent Decree at 6 (ECF No. 19). The EPA allowed the company to choose which facility to test, Nov. 2, 2011, letter to Global Partners, Kudarauskas Decl. Ex. C at 47 (ECF No. 19-3), and Global apparently chose the one in South Portland.

burning stoves or boilers in Cumberland County.  Consent Decree ¶¶ 8, 11, 14 (ECF No. 4-1).  The proposed decree also includes penalties in case Global fails to meet any of the requirements in the future.  Id. ¶¶ 30-42.  The EPA estimates that the terms of the consent decree will result in Global emitting 20 fewer tons of VOCs each year and will cost Global a total of about $440,000.  Gov't's Consent Mot. to Enter Consent Decree (Mot.) at 9 (ECF No. 19); Kudarauskas Decl. ¶¶ 7, 11 (ECF No. 19-3).  The EPA says the supplemental wood-burning stove project has a sufficient "nexus" to Global's VOC emissions because newer or retrofitted wood stoves emit fewer VOCs than older stoves do, so the replacement program will reduce VOCs in the same county where Global emitted excessive VOCs (albeit the county is a geographic area much larger than South Portland).  Mot. at 13 (ECF No. 19).

The EPA held a 30-day public comment period that it later extended to 90 days—60 days longer than required by federal regulation.  See 28 C.F.R. § 50.7(b).  It received about 90 comments.  Mot. at 1 (ECF No. 19).  The comments overwhelmingly opposed the consent decree.  See Comments (ECF No. 19-1).  They said the $40,000 penalty was inadequate to punish Global for polluting the community over many years, or to dissuade Global or other companies from violating environmental laws in the future.  They raised concerns about odors and hazardous air pollutants emanating from Global's tanks but not addressed by the decree.  They criticized the EPA for failing to inform the City of South Portland or its residents about the excessive emissions over the nearly five years between when the EPA learned about the emissions and when it filed the complaint in this case.  Finally, many commenters criticized the proposed

decree's lack of an ongoing air monitoring requirement and what they saw as an inadequate connection between the wood stove project and the harm caused by Global. The EPA responded to the public comments but did not seek to alter the proposed decree or withhold its consent. <u>See</u> Responsiveness Summ. (ECF No. 19-2). After the close of the public comment period, the EPA filed the consent motion to enter the decree.

On October 31, I entered a procedural order with three questions for the parties: (1) whether the record—which was limited to the complaint, proposed decree, motion to enter the decree, and documents attached to the motion— should contain more information about the parties' legal and factual contentions and their bargaining efforts; (2) whether voluntary actions undertaken by local and state authorities are relevant to my consideration of the proposed decree; and (3) asking for additional information concerning a section in the proposed decree on the procedures and burden of proof required to enforce the decree. Proc. Order at 3-5 (ECF No. 20). The parties provided responses that sufficiently satisfied my concerns. <u>See</u> Defs.' Resp. to Proc. Order (ECF No. 21); Gov't's Resp. to Proc. Order (ECF No. 22). The content of their responses is interspersed in the relevant places below. Whether to enter the proposed consent decree is now ripe for decision.

**ANALYSIS**

In deciding whether to grant the parties' request to enter their consent decree, I must review the decree to ensure that it is fair, reasonable, and "faithful to the statute's objectives." <u>City of Bangor v. Citizens Commc'ns Co.</u>, 532 F.3d 70, 93 (1st Cir. 2008) (quoting <u>United States v. Charles George Trucking, Inc.</u>,

34 F.3d 1081, 1084 (1st Cir. 1994)).[4]  The First Circuit Court of Appeals, whose law I follow, recognizes "the strong public policy in favor of settlements, particularly in very complex and technical regulatory contexts"—especially where, as here, "the settlement has been advanced for entry as a decree by a government actor committed to the protection of the public interest and specially trained and oriented in the field."  United States v. Comunidades Unidas Contra La Contaminacion, 204 F.3d 275, 280 (1st Cir. 2000); see also Charles George Trucking, 34 F.3d 1081, 1085 (1st Cir. 1994) ("[A] trial court, without abdicating its responsibility to exercise independent judgment, must defer heavily to the parties' agreement and the EPA's expertise.").  With that deference in mind, I review the proposed decree's fairness, reasonableness, and consistency with the Clean Air Act.  I also consider the many public responses opposing the decree.

**_Fairness_**

The fairness requirement contains two elements.  The decree must be procedurally fair—requiring, among other things, that the parties engaged in "arm's length, good faith bargaining"—and substantively fair, a standard that considers "concepts of corrective justice and accountability."  Comunidades Unidas, 204 F.3d at 281.

---

[4] The First Circuit sometimes includes adequacy as an additional requirement.  See, e.g., United States v. Comunidades Unidas Contra La Contaminacion, 204 F.3d 275, 279 (1st Cir. 2000) ("[A] consent decree must bear the imprimatur of a judicial judgment that it is fair, adequate, reasonable, and consistent with the objectives of Congress.").  The Second Circuit has persuasively pointed out that the adequacy standard comes from Fed. R. Civ. P. 23(e)(2) for class action settlements, not government consent decrees.  SEC v. Citigroup Glob. Mkts., Inc., 752 F.3d 285, 294 (2d Cir. 2014).  In practice, however, whether the adequacy prong is expressly included or not, it is subsumed by the other elements, particularly the reasonableness requirement.  See, e.g., United States v. Charles George Trucking, Inc., 34 F.3d 1081, 1085 (1st Cir. 1994) (considering adequacy in the context of reasonableness); City of Bangor v. Citizens Commc'ns Co., 532 F.3d 70, 94 (1st Cir. 2008) (same).

### *Procedural Fairness*

"To measure procedural fairness, a court should ordinarily look to the negotiation process and attempt to gauge its candor, openness, and bargaining balance." United States v. Cannons Eng'g Corp., 899 F.2d 79, 86 (1st Cir. 1990).

The parties here engaged in extensive negotiation over a years-long period, and each was represented by experienced counsel. The negotiation process involved "at least four in-person meetings and about 40 telephone calls," with the parties exchanging "numerous drafts" of the proposed decree and moving from their initial bargaining positions. Defs.' Resp. to Proc. Order at 3-4 (ECF No. 21). They "exchanged information regarding the factual bases for the United States' claims and the measures that Defendants would agree to take as part of a settlement," and they "debated the meaning and reliability of the evidence." Gov't's Resp. to Proc. Order at 2 (ECF No. 22). Global disputed—and continues to dispute—whether it violated the license, as well as the details of the sampling protocol and data, which Global believes "substantially inflated the potential emissions from the facility." Defs.' Resp. at 3-4.

There is no evidence that the parties' negotiation was anything other than open, candid, and conducted at arms' length and in good faith. I find the proposed decree is procedurally fair.

### *Substantive Fairness*

The consent decree's procedural fairness is a factor in assessing its substantive fairness. Cannons, 899 F.2d at 87 n.4 ("To the extent that the process was fair and full of 'adversarial vigor,' the results come before the court with a much greater assurance of substantive fairness."). But substantive

fairness also embraces "concepts of corrective justice and accountability: a party should bear the cost of the harm for which it is legally responsible." Id. at 87. "[T]hese concepts do not lend themselves to verifiable precision. In environmental cases, EPA's expertise must be given 'the benefit of the doubt when weighing substantive fairness.'" Comunidades Unidas, 204 F.3d at 281 (quoting Cannons, 899 F.2d at 88).

The EPA says the consent decree is substantively fair because it reduces Global's VOC emissions by about 20 tons per year, and it further reduces other VOC emissions in the community through the wood stove replacement program. Mot. at 20 (ECF No. 19). The EPA says that the $40,000 civil penalty "reflects the seriousness of the violations" while serving "to deter others from polluting the air" in violation of the Clean Air Act. Id. at 14, 20. It notes that Global is "also subject to stipulated penalties for not complying with the Decree's obligations, which should deter future violations." Id. at 20.

Many public comments criticized two aspects of the decree that go to the proposal's substantive fairness: the amount of the penalty and whether Global should pay for ongoing air monitoring.[5]

Commenters said the $40,000 penalty is too low to be meaningful to Global or to deter Global or other corporations from violating environmental laws in the future. The EPA responded that the penalty "reflects a compromise of disputed claims that avoids costly and protracted litigation, and preserves Government

---

[5] These concerns may also apply to the decree's reasonableness and consistency with statute. I discuss them here because this is the first part of the analysis in which they arise. See Cannons, 899 F.2d at 90 ("The three broad approval criteria were not meant to be mutually exclusive and cannot be viewed in majestic isolation.").

resources." Responsiveness Summ. at § X, p. 24 (ECF No. 19-2).  The EPA said that it determined the penalty after it "calculated economic benefit [to Global from the excessive emissions], assessed the gravity of the alleged violations, considered litigation risk, and otherwise weighed the factors set forth in the [EPA's Clean Air Act] penalty policy."  Id.  The EPA concluded that the penalty "will deter future violations, especially when taking into account the injunctive relief and other measures Global will perform."  Id.  And of course there are other expenditures Global must undertake under the proposed decree.  The EPA estimates that in total the decree will cost Global about $440,000.  Mot. at 9 (ECF No. 19); Kudarauskas Decl. ¶ 11 (ECF No. 19-3).

I do not second-guess the government's bargaining strategy, and the "EPA's expertise must be given 'the benefit of the doubt when weighing substantive fairness.'"  Comunidades Unidas, 204 F.3d at 281.  "[A]s is true of consent decrees generally, [the penalty is] built upon compromise and compromise in turn is a product of judgment."  Id. at 282.  Although the penalty when viewed alone seems low, I do not have evidence that it is substantively unfair.

Many commenters also questioned why Global will not be required to institute ongoing air monitoring around the tanks, a requirement that would alert the EPA and the public to future violations.  In fact, the Maine DEP and the City of South Portland recently began monitoring sites around the city.  Me. Dep't of Envtl. Prot., *South Portland Ambient VOC Air Quality Monitoring Project*, https://www.maine.gov/dep/air/monitoring/spo-voc-monitor.html (last visited Dec. 19, 2019).  But their actions are not at Global's expense.  The EPA says that

Global could not be *compelled* to implement ongoing air monitoring because (1) neither the Clean Air Act nor EPA regulations require a defendant to implement air monitoring to address the violations at issue here, and (2) air monitoring could not be implemented using a supplemental environmental project because the latter are "voluntary programs," so "a defendant cannot be compelled to adopt a particular project as a [supplemental environmental project]." Responsiveness Summ. at § VI, p. 18 (ECF No. 19-2). This explanation is not really satisfactory. The parties negotiated a settlement. The EPA could not compel the woodburning stove supplemental project either, but it negotiated its inclusion. The EPA could have sought ongoing air monitoring at Global's expense when it negotiated the decree; it has shown no reason why such a term would be barred by law. But the EPA apparently chose not to. As with the amount of the penalty, this decision was presumably part of the EPA's negotiating strategy. Although I am skeptical, I am not in a position to second-guess that strategy.

Ultimately, the question here "is not whether the settlement is one which the court itself might have fashioned, or considers as ideal, but whether the proposed decree is fair, reasonable, and faithful to the objectives of the governing statute." Cannons, 899 F.2d at 84. There is no specific evidence to indicate that Global will not "bear the cost of the harm for which it is legally responsible." Id. at 87. Under the applicable standard, and considering the proposed decree's procedural fairness and my obligation to give the EPA "the benefit of the doubt," id. at 88, I conclude that the decree is substantively fair.

***Reasonableness***

"In examining the reasonableness of a decree there are three factors for the Court to consider: (1) whether the decree is technically adequate to accomplish the goal of cleaning the environment, (2) whether it will sufficiently compensate the public for the costs of the remedial measures, and (3) whether it reflects the relative strength or weakness of the government's case against the environmental offender." United States v. District of Columbia, 933 F. Supp. 42, 50 (D.D.C. 1996); see Comunidades Unidas, 204 F.3d at 281 (citing District of Columbia with approval); Cannons, 899 F.2d at 89-90 (identifying the same three factors). "The question is whether the decree provides for an efficient clean-up and adequately compensates the public for its costs, in light of the foreseeable risks of loss." United States v. Charter Int'l Oil Co., 83 F.3d 510, 521 (1st Cir. 1996).

The EPA says that the consent decree "is reasonable and technically adequate because it requires specific, tailored corrective actions that [Global] must take to address the violations identified in the Complaint." Mot. at 22 (ECF No. 19). I agree that the decree "is technically adequate to accomplish the goal of cleaning the environment." The decree imposes a variety of requirements on Global aimed at reducing its VOC emissions, and the EPA tells me that it will reduce Global's VOC emissions by about 20 tons per year. Id. at 20. It also requires Global to apply for an amended state license. Consent Decree ¶ 11(e) (ECF No. 4-1). These requirements are sufficient to achieve the goal of limiting Global's VOC emissions and thereby cleaning the environment of the excessive emissions identified in the complaint.

The second prong concerns "whether the settlement satisfactorily compensates the public for the actual (and anticipated) costs of remedial and response measures." Cannons, 899 F.2d at 90. That consideration is not applicable here where, unlike in some environmental cases, the government has not contemplated a clean-up or other remedial measures. See Charter, 83 F.3d at 521 (analyzing whether settlement was reasonable in light of "the government's total unrecovered response costs of $4 million").[6]

My analysis under the third prong recognizes the EPA's assertion that the proposed decree "reflects a compromise of disputed claims that avoids costly and protracted litigation, and preserves Government resources." Responsiveness Summ. at § X, p. 24 (ECF No. 19-2). The EPA says that if this case went to trial, it "likely would require a battle of experts," Mot. at 22 (ECF No. 19), meaning the case would be expensive and time-consuming, "without any guarantee of the United States succeeding on the merits," id. at 9. The parties dispute, among other things, the air sampling protocol and resulting data, and whether the facility's emissions have exceeded or could exceed the license's limits. Defs.' Resp. to Proc. Order at 3-4 (ECF No. 21). The record does not make clear the relative strength of these arguments, although I note that the Maine DEP apparently uses a different method to calculate VOC emissions than does the EPA, and it does not believe the defendants violated their state license. See Comments at 25 (ECF No. 19-1) (City of South Portland comment). Despite the

_____

[6] The $40,000 penalty cannot be considered compensation to state and local government for costs related to, for example, ongoing air monitoring because federal law requires it be paid to the federal government, not the state or city. 31 U.S.C. § 3302(b).

limited information, I find, based on the parties' statements, that the proposed decree takes into account "the relative strength of the parties' litigating positions." Cannons, 899 F.2d at 90.

### Consistency With Statutory Objectives

The Clean Air Act is intended to "to protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare and the productive capacity of its population." 42 U.S.C. § 7401(b)(1). The final step is for me to determine whether the proposed decree is "faithful to the objectives" of that law. Cannons, 899 F.2d at 84. I conclude that it is. The consent decree reduces VOC emissions from Global's facility and from the wider community through replacement of wood-burning appliances, thereby "protect[ing] and enhanc[ing] the quality" of the air in the area.

At this stage, I must also consider the "strong public policy in favor of settlements," since they reduce the time and expense required to achieve Congress's statutory goals. United States v. Davis, 261 F.3d 1, 26-27 (1st Cir. 2001). This factor further supports the conclusion that the proposed decree is consistent with the objectives of the Clean Air Act.

### Public Reaction

Apart from the factors considered above, I want to discuss separately the public response to this proposed decree, which has been almost universally negative. See generally Comments (ECF No. 19-1).

I have reviewed the written public comments,[7] and I agree with the EPA that they "do not disclose facts or considerations that indicate that the proposed judgment is inappropriate, improper, or inadequate." Mot. at 24 (ECF No. 19). Most of the public comments involve concerns other than VOC emissions. For example, many brought up odors and hazardous air pollutants that residents believe are emanating from Global's facility. But the government's complaint in this case concerned only Global's VOC emissions. When deciding whether to enter the proposed decree, I must evaluate it against that complaint. See SEC v. Citigroup Glob. Mkts., Inc., 752 F.3d 285, 297 (2d Cir. 2014) (finding it was an "abuse of discretion" to reject consent decree on the basis that the court "believed the [government agency] failed to bring the proper charges"); Davis, 261 F.3d at 22 ("[A] consent decree must . . . come within the general scope of the case based on the pleadings."). Therefore, this consent decree is not the proper vehicle for addressing issues other than VOC emissions, and comments about those other issues cannot affect my decision about whether to enter the decree.[8]

Comments also complained that the City of South Portland was not notified about Global's emissions until the EPA filed its complaint in this lawsuit. The EPA disagrees,[9] but this is another concern that falls outside the scope of

---

[7] No party has requested a hearing on this matter and, in any event, evidentiary hearings on consent decrees in environmental cases are disfavored even when they are requested. Comunidades Unidas, 204 F.3d at 278.

[8] The EPA does note that one part of the consent decree, requiring Global to install "mist eliminators" to reduce vapors from the facility, may reduce odors. Mot. at 25 (ECF No. 19); Consent Decree ¶ 11.d (ECF No. 4-1). But this assertion is not a factor in my decision.

[9] The EPA says that it notified the Maine DEP when it issued the violation notices to Global in 2014 and again in 2015, and it posted those notices to a public online database. Kudarauskas Decl. ¶¶ 14, 15 (ECF No. 19-3). In 2016, the EPA met with the City of South Portland to discuss Clean Air Act enforcement, and it passed along information about the violation notices. Bird Decl. ¶¶ 5-6 (ECF No. 19-4).

the complaint and proposed consent decree. In any event, the EPA notes that new state legislation requires Maine's Department of Environmental Protection to share information about air violations with local communities. Mot. at 24 (ECF No. 19); <u>see</u> 38 M.R.S.A. § 589-A; Scott Thistle, *Mills Signs Bill Requiring State to Alert Communities to Federal Air Quality Violations*, Portland Press Herald (June 18, 2019), https://www.pressherald.com/2019/06/18/mills-signs-bill-requiring-state-to-notify-cities-of-federal-air-quality-violations/ (last visited Dec. 19, 2019). While that state law is outside the scope of this case and not relevant to whether I should enter the proposed decree, it likely will address at least some of the public concerns raised during the comment period.

Comments also criticized the supplemental environmental project involving wood-burning stoves and boilers. The criticism is understandable, since replacing older wood stoves does not address the actual emissions from Global's tanks. But a supplemental environmental project is not intended to address those emissions; other parts of the proposed decree do that. Instead, supplemental environmental projects "go beyond what could legally be required in order for the defendant to return to compliance, and secure environmental and/or public health benefits in addition to those achieved by compliance with applicable laws." EPA, *Supplemental Environmental Projects Policy 2015 Update* at 1 (2015), https://www.epa.gov/sites/production/files/2015-04/documents/sepupdatedpolicy15.pdf (last visited Dec. 19, 2019). The supplemental project in this case is intended to improve the community's air quality along the same dimensions that the EPA says Global harmed it. Since Global allegedly emitted excessive VOCs, the supplemental environmental

project is aimed at reducing VOCs in the area.  What is less clear is whether this supplemental project will have any effect.  Several commenters stated that few residences in Cumberland County use wood-burning stoves or boilers.  The EPA responded with statistics showing there are several thousand wood-burning appliances in Cumberland County and said it "believes there is great opportunity for the [supplemental environmental project] to reduce the harmful emissions associated with wood burning appliances."  Responsiveness Summ. at § XI, p. 29 (ECF No. 19-2).

To sum up, the commenters' concerns, as valid as they may be, do not raise doubts about whether the proposed decree is fair, reasonable, and "faithful to the statute's objectives."  City of Bangor v. Citizens Commc'ns Co., 532 F.3d 70, 93 (1st Cir. 2008).  Since I "must defer heavily to the parties' agreement and the EPA's expertise," United States v. Charles George Trucking, Inc., 34 F.3d 1081, 1085 (1st Cir. 1994)—and since no party at this point is arguing against the decree—I conclude that the public comments are not enough to justify rejecting the proposed decree.

### CONCLUSION

For the reasons explained above, I conclude that the proposed decree is fair, reasonable, and consistent with the objectives of the Clean Air Act. Therefore, I **GRANT** the motion to enter the consent decree.

**SO ORDERED.**

**DATED THIS 19TH DAY OF DECEMBER, 2019**

/S/D. BROCK HORNBY
**D. BROCK HORNBY**
**UNITED STATES DISTRICT JUDGE**